# SAMUEL J. WRIGHT vs. JANE E. WRIGHT'S Lessee.

The act of 1840, ch. 428, passed on the 8th of March 1850, divorcing the parties to this cause *a vinculo matrimonii*, is a constitutional and valid exercise of legislative authority.

By the earlier law of England, a marriage, valid at the time of its solemnization, was held to be indissoluble. Conjugal infidelity only furnished a a ground for separation, but nothing short of death could release the nuptial bond.

A complete annulment of the tie could only be obtained by the establishment of some antecedent impediment, such as undue consanguinity, physical incompetence, or mental incapacity.

In England, the ecclesiastical courts exercised *exclusive* jurisdiction over the subject of divorces, until the commencement of the eighteenth century, when the refusal of those courts to grant divorces *a vinculo*, even in cases of the grossest conjugal delinquency, induced applications to parliament, and since that time parliament has exercised the power of granting divorces *a vinculo*, for causes supervenient the marriage.

In this State, divorces, from the earliest times, have emanated from the General Assembly, and can now be viewed in no other light than as regular exertions of legislative power.

This exercise of power by the legislature may have grown out of the fact of there being no ecclesiastical courts in Maryland, or have been borrowed from the action of the British parliament.

The acts of 1841, ch. 262, and 1844, ch. 306, authorising the courts of equity to decree divorces in certain specified cases, do not divest the legislature of all power over the subject, or give to the equity courts of the State *exclusive* jurisdiction of the subject of divorces.

The delegation of authority to the courts, to act in certain enumerated cases, does not necessarily involve the negation of a reservation of power to the legislature to act either in the same or in other and a different class of cases.

The acts of 1841 and 1844, were at all times, after their passage, subjects of revision and repeal. The legislature could repeal them in whole or in part, or suspend for a time their operation, and whenever it granted a divorce for any cause mentioned in those acts, they were, *pro tanto*, repealed.

Except in the case of a grant or other contract, there is no constitutional power residing in one legislature to limit the power of succeeding legislatures: with this exception, all legislatures are co-equal—what one may do a succeeding one may also do or undo.

The organization of society, no less than the constitution, contemplates the existence of the legislative power as indestructible, and as co-existent with itself and the organic law.

HARVARD LAW SCHOOL LIBRARY

The case of *Crane vs. Meginnis*, 1 G. & J., 463, regards the act of 1777, ch. 12, sec. 14, as but affirming the law of remedy as it had previously existed, and decides the allowance of alimony always to have been a *judicial*, and the granting of divorces in this State a regular, exercise of *legislative* power.

The acts of 1841 and 1844 did not confer on the courts jurisdiction of divorces in cases other than those *specially enumerated in them.*

When a case comes before this court on a case stated, it is not allowable to this court to draw inferences of fact from those contained in the agreed statement, when no such power has been given by the assent of the parties.

In this case the statement of facts shows, that the wife, in her petition to the legislature, alleged the adultery and desertion of her husband for several years. The act granting the divorce does not state the grounds on which it passed. HELD:

That the desertion may have been for a less period than that for which the courts are empowered to grant a divorce *a vinculo*, and if so, then in any aspect of the case the legislature had jurisdiction of the subject.

In the absence of all evidence to the contrary, this court must assume, that the action of a co-ordinate branch of the government, has been within the limits prescribed by the constitution.

The acts of 1829, ch. 202, and 1840, ch. 238, authorising notice to be given to the opposite party in cases of applications for divorces, are repealed, *pro tanto*, by the act of 1849, ch. 428, divorcing the parties to this suit.

As a general proposition it is undoubtedly true, that it is contrary to the first principles of justice to bind a person by an action of which he had no notice. Hence, a party cannot be *personally* bound by a judgment, when he has not been summoned or had notice of the proceedings. But the rule is different where the judgment operates *in rem.*

It is also true, that all judgments rendered in any court against a party who had no notice of the proceeding, are void, and sentences obtained by collusion are mere nullities, and all other courts may examine into facts upon which a judgment has been obtained by fraud; but the case of legislative action is entirely different.

If the passage of a particular act be but a *regular exercise of legislative power,* notice is unnecessary. The legislature may, of its own motion, without suggestion from or to any other body or person, exercise the power with which it is endowed by the constitution. In this particular its acts are distinguished from those of the judiciary.

Under the 21st sec. of the bill of rights a person may be imprisoned, disseized of his free-hold, &c., provided it be done by the judgment of his peers or by the law of the land.

The words, "by the judgment of his peers," mean a trial by jury, and the words, "by the law of the land," mean due process of law according to the course and usage of the common law.

By the third section of the bill of rights the inhabitants of this State are entitled to the common law of England, subject, nevertheless, to the revision of, and amendment or repeal by, the legislature.

The evident purpose of the sixth section of the bill of rights, which declares that "the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other," is to parcel out and separate the powers of government, and to confine particular classes of them to particular branches of the supreme authority, such as are judicial in their character, to the judiciary, &c.

Within the particular limits assigned to each, the several co-ordinate departments of government are supreme and uncontrolable.

It being but a *regular exercise of legislative power* for the legislature to grant a divorce, it is not within the authority of the judiciary to pronounce its action in the premises null and void.

In passing such an act the legislature but announces its will, as it is authorised to do by the constitution, and there its power ceases. The legal consequences flowing from such an act it is for the judiciary to determine.

If, in divorcing the parties, the legislature had attempted to deal with questions of property, such attempt would have been an assumption of power unauthorised by the constitution.

At the time of the marriage, the wife was seized in fee of certain real estate, in which her husband never had any interest except such as he acquired by virtue of the marriage. There was no issue by the marriage, and the parties were divorced by the legislature *a vinculo*, by the act of 1849, ch. 428; HELD:

That the effect of this act was to restore to the wife the real estate of which she was seized at the time of the marriage, and which had not been conveyed away *during coverture* by the joint act of herself and husband.

In England, since the parliament has exercised the power to annul marriages, it is the settled usage to introduce property clauses regulating the rights and liabilities of the parties after divorce.

By marriage, the husband becomes entitled to a free-hold interest, *in right of the wife*, so long as the coverture lasts, in all such free-hold property of inheritance as she was seized of at the time of the marriage, or may become seized of during the coverture.

If the passage in 1 *Roper on Husband and Wife*, 3, which says, that the husband, by marriage, acquires a free-hold interest in the wife's free-hold estate, "during the *joint lives* of himself and wife," be understood as asserting, that by virtue of the marriage alone, he acquires a free-hold estate in *his own right* for the joint lives of himself and wife; the authorities cited for the proposition do not sustain it.

*Coke Litt*, 351, and *Grenely's Case* in 8 *Coke*, 72, decide, that the estate which the husband takes by marriage exists in privity, and when this privity ceases the estate necessarily ceases with it.

As the estate of the husband exists only during coverture, a divorce *a vinculo matrimonii* restores the wife to her estate as she had enjoyed it prior to her marriage.

The case of *Stephens vs. Totty*, reported in *Croke Elizabeth*, 908, is not in conflict with this doctrine, but sustains it; and the same doctrine has been held and recognized in the courts of several of the States of this Union.

APPEAL from Queen Anne's county court.

The appellee was divorced from the appellant, her husband, *a vinculo matrimonii*, by the act of 1849, ch. 428, passed on the 8th of March 1850, and instituted this action of *ejectment*, to recover her real estate from the possession of the appellant, who continued to hold it after the divorce. The cause was tried in the county court, upon a statement of facts set out in full in the opinion of this court. The court below gave judgment for the plaintiff, and the defendant appealed.

The cause was argued before LE GRAND, C. J., MASON and TUCK, J.

*Robinson* for the appellant, contended:

1st. That the act of 1849, divorcing the parties to this suit, was an exercise of judicial power, repugnant to the constitution, and therefore void.

The power of granting divorces properly belongs to the judicial rather than to the legislative department of government. In England it was formerly the exclusive right of the ecclesiastical courts to grant divorces. In this State divorces have been granted by the legislature, but the act of 1841, ch. 262, transferred this power to the courts of equity, and the question now is, can the legislature, since the passage of that act, exercise the power concurrently with the courts?

The bill of rights, *article* 6, provides, that "the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other." What is the meaning of this maxim, which is found generally incorporated into the constitutions of the several States? The obvious meaning is, that the duties appropriately belonging to one

department shall be exclusively performed by it, and not be interfered with by any other co-ordinate department. Such is the interpretation given to it in the cases of *Crane vs. Meginnis,* 1 *G. & J.,* 464, and *The University of Md. vs. Williams,* 9 *G. & J.,* 410. The decisions in these cases show, that judicial powers can be exercised only by the courts.

It is undeniable that the courts of equity, under the act of 1841, ch. 262, have the power to grant divorces. The cases of *Ricketts vs. Ricketts,* 4 *Gill,* 108*; Brown vs. Brown,* 5 *Gill,* 249*; Bayly vs. Bayly,* 2 *Md. Ch. Decisions,* 326*; Daiger vs. Daiger, Do.,* 335*; Coles vs. Coles, Do.,* 341*;* and *Tayman vs. Tayman, Do.,* 393, are all instances of the exercise of such power by the courts.

The legislature having divested itself of this power, by transferring it to another co-ordinate branch of the government, can no longer have concurrent jurisdiction over the subject. If it could, there would be a complete blending of the several powers of government. Previous to the act of 1777, ch. 12, sec. 14, the legislature having the power to grant divorces, could also grant alimony, which is but an incident to divorce. 4 *H. & McH.,* 477, *Galwith vs. Galwith.* The act of 1777, transfers the power to grant alimony to the court of chancery, and in *Crane vs. Meginnis,* the Court of Appeals say, the power to grant alimony by the legislature is gone. Now the act of 1841, ch. 262, in the same words as the act of 1777, confers upon the courts of equity the power to grant divorces, hence the power of granting divorces by the legislature is also gone. The cases of divorce and alimony are precisely similar, and if the party could have redress by an application to the courts, the redress given by the legislature is an attempt to exercise judicial power, and is therefore void.

It is true that the legislature may, by a general law, take back the power, but they cannot act in a particular case. Suppose the case of the appointment of county clerks. The legislature once had this power, but by the act of 1844, they gave it to the judges of the county courts. Could the legis-

lature after this act appoint a clerk for a particular county? They may pass a general divesting law, but not a particular law for a particular case. The act of 1849 is no more a repeal, *pro tanto*, of the act of 1841, than the act of divorcing and giving alimony to *Mrs. Meginnis,* which the Court of Appeals decided to be unconstitutional and void, was a repeal, *pro tanto*, of the act of 1777.

2nd. The act of 1849 was an *ex-parte* proceeding, without the knowledge or consent of the appellant, and is therefore void. It is in fact nothing but a judgment or sentence without notice, and can have no effect upon a person not a party to or notified of the proceedings. 2 *Kent Com.,* 91. 5 *Johns.,* 39. 1 *New Hamp. Rep.,* 242. 4 *H. & McH.,* 11. 3 *Wilson,* 297, *Fisher vs. Lane.* 9 *G. & J.,* 408, 412. 3 *Dallas,* 175. 1 *Md. Ch. Decisions,* 252. The acts of 1829, ch. 202, and of 1840, ch. 238, require, that in all cases of applications to the legislature for divorces, notice shall be given to the opposite party. There was no notice in this case and how can it be taken out of the general rule. The parliament of England never grants a divorce except upon summons to both parties, and where both are before them. *Shelford on Divorce,* 33 *Law Lib.,* 201.

3rd. The marriage vested in the husband a *freehold interest* in the wife's real estate during *their joint lives,* whether there be issue or not. *Roper on Husband and Wife,* 21 *Law Lib.,* 12. 1 *Bright on Husband and Wife,* 112. 1 *Hilliard on Real Property,* 120. 2 *Kent Com.,* 112. *Coke Litt.,* 351. Being vested with such freehold estate, he could only be divested of it by "the judgment of his peers or the law of the land." *Bill of Rights, Art.* 21. 9 *G. & J.,* 412. 1 *Black Com.,* 44. 1 *Md. Ch. Decisions,* 252. The phrase "judgment of his peers or the law of the land," does not refer to a legislative act, but to a judicial trial. 4 *Dev.,* 412.

4th. A divorce, *a vinculo matrimonii,* by the legislature for adultery, does not restore the wife the property which she brought into the marriage. *McQueen on Husband and Wife,* 59 *Law Lib.,* 129.

*Grenely's case,* 4 *Coke,* 283, in which it was decided that the wife was restored to her property, was one in which the marriage was declared null and void, *ab initio,* and not for causes supervenient the marriage. This has been the foundation of all the cases from that time down. The principle of the decision is, that the wife shall have her property, because there was *in fact no marriage,* and this reason will not apply to a divorce granted by the legislature, for such a divorce, when for causes supervenient, presupposes a *valid marriage.* 2 *Croke Eliz.,* 908. 2 *Bright on Husband and Wife,* 364, 366. *McQueen on Husband and Wife,* 138, *sec.* 210. The effect of divorces, *a vinculo,* by the ecclesiastical courts, is to restore the property, because such divorces declare the marriage void *ab initio.* 2 *Bright on Husband and Wife,* 265, 208. 2 *Burns Eccl. Law,* 459. But parliament inserts a clause in parliamentary divorces to bar the wife of her dower. Issue are not bastardised by a parliamentary divorce. Why is this? It clearly shows that the two kinds of divorce, the one where the marriage is void *ab initio,* and the other for causes supervenient, have different incidents and fruits. 1 *Thos. Coke,* 147. At common law adultery does not deprive the wife of her dower. 1 *Bright on Husband and Wife,* 155, *sec.* 19. The husband is bound to support the children. *Shelford on Divorce,* 689.

The cases from Massachusetts, Connecticut and Vermont, that will be cited on the other side, are not applicable to this case. The case in 8 *Mass.,* 99, does not cite the principles of the common law to support it, but is based on the statute of *Mass.,* of 1785, *ch.* 76, *sec.* 27, which expressly provides, that upon a divorce the wife shall have the property as if the husband were dead. There is no such statute in Maryland. 10 *Mass.,* 265, cites authorities in *Blackstone,* which only decide that ecclesiastical divorces restore the property. The reasoning of the case in 8 *Conn.,* 541, will not apply here, for a wife in this State may file her bill for alimony. The law here even permits the sale of the tenancy by the courtesy. In Vermont there is also a statute restoring the property to

the wife, in the same words as that of Massachusetts. The authority in 1 *Hilliard on Real Property*, 119, is based upon the statutes of the several States.

*Emory* for the appellee, maintained:

1st. That in 1849 the legislature of Maryland had a constitutional right to pass bills of divorce, *a vinculo matrimonii*, and the act divorcing Mrs. Wright from the appellant was a valid exercise of legislative authority, and operative for the purpose of dissolving the marriage. *Crane vs. Meginnis*, 1 *G. & J.*, 463. *Starr vs. Pease, et al.*, 8 *Conn.*, 541, 476. Divorces were first granted by parliament about the year 1700, and it is now settled that they can only be granted by parliament. Since the revolution our legislature have constantly granted them. The act of 1841, ch. 262, did not design to divest the legislature of this power. It was intended that the legislature should have concurrent jurisdiction with the courts of equity over the subject of divorces. Indeed the legislature could not divest itself of the power to grant divorces, much less could it deprive future legislatures of this power. If the legislature has the power to repeal the whole act of 1841, why has it not the power to repeal it in a special case? The sovereign power has the right to grant divorces. 1 *G. & J.*, 474, 475. The three departments of government have never been entirely separate and distinct. 3 *Dallas*, 398, 399. *Federalist, No.* 47, *p.* 194. The proper exercise of judicial power consists in expounding and administering existing laws, and not in making new laws for particular cases. The granting of divorces is a clear exercise of legislative power, and such divorces have been granted ever since the revolution. If the construction contended for on the other side is to prevail, all divorces granted by the legislature since the act of 1841 are invalid, and where the parties have married again they have committed adultery and their issue are bastards.

The statement of facts does not warrant the inference that the appellant had not notice *in fact* of the application to the

legislature for this divorce, it only states that notice was not given to him by the appellee. As to alimony, the courts have always had the power to grant it, and the legislature have never attempted to grant it. 1 *G. & J.*, 475.

2nd. This divorce being valid the appellee is entitled to recover the possession of her land, because there was no estate in the husband which could survive to him after the dissolution of the marriage by a divorce *a vinculo*, he having a right only to the pernancy of the profits during the existence of the coverture, and no freehold *in his own* right in her lands. 1 *Black Com.*, 345, 355, 353. 2 *Do.*, 349, 433. Divorce dissolves the marriage, destroys the unity of person, and restores the parties to their original rights. *Coke*, 351, 326, 66 *(b.,)* 67 *(a.)* *Roper on Husband and Wife*, 70. 2 *Bright on Husband and Wife*, 366. 2 *Crabb on Real Property*, 65, sec. 1075. *McQueen on Husband and Wife*, 59 *L. L.*, 27, *(marg.)* 4 *Coke's Rep.*, 73. 1 *Cruise's Digest*, 39. 1 *Bright on Husband and Wife*, 112. 8 *Reports*, 145. The general principle of American law is, that where a marriage is terminated by a divorce *a vinculo*, the wife is restored to her property. 1 *Hilliard on Real Property*, 117, 118, 119. 1 *Greenleaf's Cruise*, 151, 152. 8 *Conn.*, 541. 10 *Conn.*, 230. 8 *Mass.*, 99. 10 *Mass.*, 262. 1 *Tyler's Rep.*, 414. 9 *Vermont*, 326. See also *Tucker's Black.*, 445. 2 *Wendell's Black.*, 350.

*Pearce* on the same side.

There are but two propositions to be maintained on the part of the appellee:—1st. The legislature had the power to pass the act of 1849 divorcing these parties, and that act is constitutional and valid. 2nd. The effect of this divorce was to reinvest the wife with the property she had before marriage.

1st. The legislature has always exercised the power of granting divorces, from the earliest times, as a general legislative power, and the Court of Appeals have affirmed their right to do so, in the case of *Crane vs. Meginnis*, and it is therefore as much a constitutional power as if expressly grant-

ed. The constitution of this State, unlike the constitution of the United States, is a general grant of legislative power, not a grant of specific, enumerated, powers. The legislature then having this *constitutional* power, could not, by a single act of the legislature, divest future legislatures of it. The act of 1841, if any, is therefore unconstitutional. This power has been a common power, exercised by the legislatures of other States. 2 *Kent's Com.*, 105. 8 *Conn.*, 547, 548.

The act of 1841, ch. 262, could not invalidate the act of 1849. The power of the legislature over this subject is two-fold. 1st. A general power as over the rights of property in all other cases, and under this they may authorise the courts to grant divorces, and 2nd. They have a peculiar and special power to decree divorces in individual cases.

The act of 1841, ch. 262, modified by the act of 1844, ch. 306, authorises the courts of equity to grant divorces for two causes only, adultery, and desertion for a period exceeding three years. In this case it does not appear for what cause the divorce was granted. It may have been for a desertion for a less period than three years, in which case the courts would not have the power to grant it.

The legislature never had and never claimed the power to grant alimony, and the courts have never intimated that such power was ever vested in the legislature, *Crane vs. Meginnis,* 1 *G. & J.,* 464. 4 *H. & McH.,* 477, *Galwith vs. Galwith.* The analogy therefore attempted to be drawn between the cases of divorce and alimony entirely fails. The facts are not with the counsel on the other side, his premises are wrong, and this constitutes the fundamental error of his argument.

Again it is contended that this divorce is invalid, because there was *no notice* given to the appellant. The argument on the act of 1841, applies here. The legislature had full, plenary power over the subject, and the act of 1840, ch. 238, requiring notice, could no more bind succeeding legislatures than could the act of 1841. It is clear that except in cases of contracts, as acts of incorporation, &c., one legislature has not the power to bind succeeding legislatures. Again this act of 1840,

regulating the mode of granting divorces, is nothing more than a rule of order regulating the proceedings of the legislature, which it has the power to revoke or change at will.

The fact that this was an *ex-parte* proceeding does not affect this case, because it is not a judgment but a legislative act in the ordinary exercise of legislative power, of which every citizen is presumed to be cognizant, and by which every citizen is bound. In England Parliament has rules on this subject, and it has adhered to them, but this fact is no argument here. The legislature has never been restrained by any rules, and the consequences of declaring all *ex-parte*, divorces void would be appalling.

2nd. By marriage the husband becomes the head and governor of the family. The wife is merged in the husband. He has the right to the usufruct of her realty during coverture. This right depends upon, and is commensurate with the coverture, beginning with it, and ending with it, however it may terminate by death, or, divorce *a vinculo.* He has not a freehold estate in the realty of his wife, in his *own right,* but merely in *right of his wife,* 8 *Coke,* 73. *Coke Litt.,* 67, *(a,)* 351, *(a.)* These authorities show that *Roper* is not sustained in the position, that the husband has a free-hold estate in *his own right,* during the joint lives of husband and wife, even if his language is susceptible of such construction. See *Roper on Husband and Wife;* 12, and cases there cited. The husband, until issue, has no free-hold in his own right in the estate of the wife, but a mere *pernancy of the profits.* 1 *Bright on Husband and Wife,* 112, 113, 115. 1 *Hilliard on Real Property,* 119, 120. 2 *Kent Com ,* 110. *McQueen on Husband and Wife,* 27. 2 *Crabb on Real Property,* 65, sec. 1075. 65 *Law Lib.*

It has been frequently decided that the effect of a legislative divorce is to restore her property to the wife. 5 *Dana, (Kentucky Rep.,* 256, 257.) There was no statute in Kentucky on the subject, when this decision was made. 1 *Tyler, (Vermont Rep.,)* 414. There was also no statute in Vermont at the date of this decision. See also 8 *Conn.,* 545, and 10 *Conn.,* 230. In this State, also, there is no statute. 10 *Mass.,* 262.

In this case the court relied upon the principles of the common law, and not upon the statute of that State.   See also 9 *Vermont*, 326, 335, and 9 *Gill*, 405.

*Hopper* for the appellant, in reply.

1st.  The act of 1849 is in conflict with the 6th article of the bill of rights, and is therefore unconstitutional and void. The position is, that the several departments of government should be restrained to the exercise of their appropriate duties. The very act of confiding this power over divorces to one department, is a restriction of its exercise by another department. This has been done by the act of 1841, which gives full and exclusive power over the subject of divorces to the courts of equity of this State.   See *Art.* 56, *of Old Cons.*, and *Art.* 1, *sec.* 21, *of New Constitution.*   Where the legislature increase the jurisdiction of the courts, it is not necessary that it should be done by two successive acts, because by the constitution, the legislature has this power of enlarging the jurisdiction of courts. Hence the objection to the constitutionality of the act of 1841, is not tenable.

There is a perfect analogy between the act of 1777 and 1841. Originally the power to decree alimony was vested in the ecclesiastical courts, but there being no such courts in this State, the power became vested in the legislature.

2nd.  The proceedings in this case, were *ex-parte,* without notice, and therefore void.   Private legislative acts are nothing more than sentences or judgments.  4 *H. & McH.,* 11.  9 *G. & J.,* 412.  1 *Md. Ch. Decisions,* 252.  The marriage vested in the husband a *free-hold interest* in the estate of his wife, during *their joint lives.*   All the elementary writers call it a *free-hold,* and no matter whether it be for life or during coverture, or whether it is only a right to the rents and profits, it is equally protected by the bill of rights.   He cannot be divested of it, except by the judgment of his peers or the law of the land.

3rd.  This divorce does not restore the property to the wife. The expression *"coverture,"* and during *"joint life,"* are used as synonymous by the elementary writers.   An estate given *during coverture* is in effect an estate during *joint lives.*   Cov-

erture or legal marriage under the common law could not end except by the death of one of the parties. Hence the apparent differences in the expressions are reconciled. The citizens of this State are entitled to the benefit of the common law. The expression *jure uxoris,* is an expression to designate the character of the *free-hold* which the husband and wife have.

Where a right by the common law is once vested, it cannot be divested by an act of the legislature. By the common law, adultery and desertion do not divest the husband of his interest in his wife's property. The legislature may pass a general law, and provide on what conditions divorces may be granted in future, but a special law is unconstitutional.

Tuck, J., dissented in part, and delivered the following opinion.

The first inquiry which this record suggests is, whether the act of 1849, ch. 428, divorcing these parties, was a valid exercise of legislative authority? If this be so, then the appellee is entitled to recover, because, for the reasons stated, and upon the authorities quoted in the opinion of the court, the property in controversy, on the dissolution of the marriage, reverted to the wife. But after carefully considering this question, and with every disposition to sustain the acts of a co-ordinate department of the government, I have not been able to persuade myself that its legitimate powers have not, in this instance, been exceeded.

It is unnecessary, in my view of the case, to inquire what effect the act of 1841, ch. 262 had in restraining or limiting the power of the legislature in the matter of divorces; nor is it material to examine whether the acts of 1829, ch. 202, and 1840, ch. 238, prescribed directions which it was incumbent on the legislature to pursue in the exercise of this jurisdiction. I admit that divorces in this State are to be considered as regular exertions of legislative power, 1 *Gill & John.*, 474, but I do not agree that the courts of justice must always presume that it has been rightfully exercised, and with a due regard to the rights of the party against whom the application

may have been made. Acts of Assembly like the proceedings of other branches of the government, should be supported by every fair legal intendment; and, therefore, it would be the duty of this court, in the absence of proof to the contrary, to presume that the act in question was passed under circumstances which afforded the appellant an opportunity of protecting his rights. But how can this presumption arise on the present case stated, when it contains a distinct admission that he had no notice of his wife's application for a divorce, and consequently could not have defended himself under the charge alleged against him?

It is said, that the legislature may pass such laws as are not prohibited by the constitution of the United States, or by that of the State; but I imagine, that these instruments do not furnish the only limitations. In the case of *The University of Md., vs. Williams*, 9 *Gill & Johns.*, 408, this court said, "Independent of the constitution of the United States, and of any express restriction in the constitution of the State, there is a fundamental principle of right and justice inherent in the nature and spirit of the social compact, (in this country, at least,) the character and genius of our government, the causes from which they sprang, and the purposes for which they were established, that rises above and restrains, and sets bounds to the power of legislation, which the legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty and property of the citizen from violation in the unjust exercise of legislative power." See also 2 *Kent Com.*, 339, 340, and notes, which show, that this right to protection exists, independent of any constitutional provision, as founded in natural equity, and as an acknowledged principle of universal law.

The same principle, in my opinion, may be invoked for the protection of any other rights of the citizen: and what can be more valuable, or should be more cautiously interfered with, than those growing out of the marriage relation? "A man has just as good right to his wife as to the property acquired by the marriage contract. He has a legal right to her

Wright vs. Wright's Lessee.

society and her fortune, and to divest such right without his default, and against his will, would be as flagrant a violation .of the principles of justice, as the confiscation of his own estate." *Per Justice Story*, 4 *Wheat.*, 696. And, indeed, it is on the principle of the inviolability of the contract of marriage, that divorces are granted notwithstanding the 10th sec. of 1st .art. of the constitution of the United States, "because a law punishing a breach of contract by imposing a forfeiture of the rights acquired under it, or dissolving it because the mutual .obligations are no longer observed, is in no correct sense a law impairing the obligations of the contract." 4 *Wheat.*, 696. There is no species of contract, or right, or property, that is not protected from legislative invasion. Even when the public .interests require a sacrifice of private property, it cannot be taken without making just compensation to the owner. 2 *Kent Com.*, 339. Yet this court are now called upon to declare that the legislature may, on the application of one of the parties to a marriage, *and without the knowledge of the other party*, dissolve that relation, and, as a legal consequence of the dissolution, divest rights of property acquired by the contract of marriage.

If this power resides with the legislature in this unlimited .degree, may we not ask for its origin. In the case of *Crane vs. Meginnis*, 1 *Gill & Johns.*, 474, we are told that these acts have been "performed by the legislature for the want, perhaps, of ecclesiastical authority to effect it, or borrowing, perchance, the power from the parliament of Great Britain, which sometimes granted divorces *a vinculo* for supervenient causes arising *ex post facto*, a thing that the spiritual courts could not do." It is immaterial to the question before the court whether the jurisdiction be referred to the one source or the other; for in either case, it seems to me, that all the analogies that belong to the subject should be observed, and that the forms of proceeding adopted in the ecclesiastical courts or in parliament, for the purpose of properly and advisedly exercis- .ing the power, or some such, should be regarded by the legislature when acting in cases of this kind. The ecclesiastical courts of England, whose functions, *pro hac vice*, the le-

gislature performs, would not act unless both parties were be-
fore the court, or had had an opportunity of appearing; nor
does the parliament in its omnipotence, as Blackstone extols
its authority, sever these bands upon *ex parte* proceedings.
On the contrary the utmost circumspection is observed, by
notice to the other party, and otherwise, lest this estate,
which is not to be entered into unadvisedly or lightly, may be
inconsiderately destroyed by the exercise even of their sov-
ereign authority, which is said to have no limit.

We are told, that a law which professes to act only on the
person—such as an act of divorce—passed without notice,
may be valid, when one so passed, affecting property, would
be void.   Can this be so?   Are not rights of person as sa-
cred as those of property? and if so, why shall not the same
forms and solemnities be required in the enactment of statutes
affecting one as well as the other?   But if there be such a
distinction, can it apply to this case?   The legislature cannot
commit a wrong indirectly which could not be accomplished by
direct means.   If this act contained any provision as to the
property of the parties it would be unconstitutional.   1 *Gill
& Johns.*, 474.   It, in terms, professes only to separate the
parties by a dissolution of the marriage; but the necessary le-
gal effect is to divest rights of property acquired under the mar-
riage.   Those rights are thereby as much impaired as if they
were destroyed by the very letter of the law.   In the case of
*Norris vs. Abingdon Academy,* 7 *Gill & Johns.*, 7, it was held,
that a resolution of the legislature transferring the govern-
ment of the institution to a new board of trustees, was an in-
terference with the vested rights of the old board, and void.
The resolution did not profess to act upon the property or
funds of the school, but the necessary effect of the new ap-
pointment was to transfer the property also.   If an act, which
in terms makes provision for the wife, however moderate the
amount, would be void, I think the same objection may be
urged against one which, by necessary legal consequence,
takes the property of the wife from the husband and restores
it to her.

It was also contended, that there was no infraction of the 21st art. of the bill of rights, in the passage of this act, because, if the appellee succeeds, the appellant will have lost this property by the finding of a jury, and in pursuance of a law of the land. We are informed by the Court of Appeals, in 9 *Gill & Johns.*, 412, what is understood by these terms. "They mean by the due course and process of law; the general law prescribed and existing as a rule of civil conduct, relating to the community in general, judicially to be administered by courts of justice. An act which only affects and exhausts itself upon a particular person, or his rights, or his privileges, and has no relation to the community in general, is rather a sentence than a law; a sentence that condemns without a hearing, and the very passing of which implies the absence of any general law or rule of civil conduct by which the same purpose could be judicially effected in a court of law." 1 *Bl. Com.*, 44. Does it require any argument to show, that an act of Assembly, divorcing a man from his wife passed on allegations of gross misconduct on his part, and without his knowledge, is a sentence and not a law, in the sense in which we are now dealing with the term? Does it not exhaust itself in the particular case to which it applies, and, in the one before us, is it not a sentence which condemns without a hearing?

If the views presented on the part of the appellee are correct, the marriage tie, constituting a contract of the highest dignity, and of all others the most important to society, is the only one which can be dissolved; and the consequences of that measure, embracing the relation of husband and wife, parent and child, and valuable vested interests, visited upon the supposed offending party, without affording him an opportunity of asserting and protecting his rights when thus assailed. I know of no other species of legislation, or act of any tribunal affecting individual rights which would be sanctioned in a court of justice, if objected to for want of such notice, or what would be deemed equivalent to notice. "They are in violation to the first principles of justice, and null and void." 2 *Kent Com.*, 109.

I am of opinion, that the judgment should be reversed, but as a majority of the court has decided that this act of Assembly is valid, I concur in so much of their opinion as restores the property in question to the appellee.

LE GRAND C. J., delivered the opinion of this court.

This was an action of ejectment instituted in Queen Ann's county court to recover a tract of land. It was tried on a statement of facts, and judgment rendered by the court below in favor of the appellee. The statement of facts is as follows:

"It is admitted by counsel for plaintiff and defendant, that a patent regularly issued for the tract of land mentioned in the declaration filed in the above cause; that a certain Robert Gardner was seized in fee of the land, at the time of his death in the year 1828; that the said Robert died intestate of said land, &c.; that the same descended at his death to his daughter, the plaintiff in this cause, who was his only child and heir at law; that the said Jane after the death of the said Robert entered upon, and was seized in fee of the said land, and so continued to be seized in fee of the same; that on the 10th day of May, in the year 1835, the said Jane intermarried with Samuel J. Wright of Queen Anne's county; that the said Jane and Samuel lived together after their marriage for many years, but that there never was any issue of the said marriage; that the said Samuel has held possession of the land aforesaid, from the time of the said marriage to the present time; that on the 29th of April 1845, the said Jane exhibited in Queen Anne's county court, sitting as a court of equity, *a bill against the said Samuel J. Wright, praying to be divorced from him the said Samuel, and to be restored the possession and enjoyment of her maiden property, real and personal; to which said bill the said Samuel filed his answer in said court, on the 16th of July, in the same year* 1845; and in which said case no further proceedings were had, until the May term of said court, in the year eighteen hundred and forty-nine, when the said Jane ordered the same to be dismissed; that at December session 1849, the said Jane presented to the General Assembly of Maryland, her petition, praying for a divorce, which petition

set forth the facts hereinbefore stated, and alleged the adultery of her said husband, and his desertion of the said Jane for several years; and that at the said session of the General Assembly of 1849, a bill was passed divorcing the said Jane from the said Samuel, as follows:

" 'An act to divorce Jane E. Wright, of Queen Anne's county, from her husband, Samuel J. Wright.

" ' Be it enacted by the General Assembly of Maryland, that Jane E. Wright of Queen Anne's county be, and she is hereby divorced from her husband, Samuel J. Wright, *a vinculo matrimonii.*' " That no notice of the said proceedings before and by the said legislature was given to the said Samuel; that the said Samuel never had nor has he now, any interest in the said land, other than such right or possession as he acquired by virtue of the said marriage; and that he has never made any provision for the support and maintenance of the said Jane. That the said Samuel J. Wright is in possession of the said land."

The first question which arises out of this state of facts, involves the right of the legislature to pass the act of 1849.

It is said that since the passage of the act of 1841, ch. 262, the legislature has been incompetent to take cognizance of cases of divorce, and, that all authority over such matters was by that act *exclusively* vested in the high court of chancery, and the courts of equity. If this be so, then the act of 1849 was, and is, unconstitutional and void.

According to the earlier law of England, a marriage valid at the time of its solemnization was held to be indissoluble. Conjugal infidelity only furnished a ground for separation, but nothing short of death could release the nuptial bond. A complete annulment of the tie could only be obtained by the establishment of some antecedent impediment, such as undue consanguinity, physical incompetence or mental incapacity. Until about the commencement of the eighteenth century the ecclesiastical courts exercised *exclusive* jurisdiction over the subject of divorces. The ecclesiastical courts refusing to grant divorces *a vinculo*, even in cases of the grossest conjugal delinquency, induced applications to parliament, and, it is

said, the first genuine example of a dissolution of the nuptial tie was in the case of the notorious mother of the highly gifted but unfortunate poet, Savage—the Countess of Macclesfield. Since that time the parliament have exerted the power of annulling, absolutely, the marriage bond.

In the case of *Crane vs. Meginnis,* 1 *Gill and Johnson,* 474, the constitutional power of the legislature, under the old form of government to grant divorces was fully recognized. "Divorces," say the court in that case, "in this State, from the earliest times, have emanated from the General Assembly, and can now be viewed in no other light *than as regular exertions of legislative power.*" This exercise of power may have grown out of the circumstance of there being no ecclesiastical courts within the limits of Maryland, or may have been borrowed, by analogy, from the action of the British parliament, which from the commencement of the eighteenth century, exercised the power of granting divorces *a vinculo,* for causes supervenient the marriage.

The granting of divorces being but a "*regular exercise of legislative power,*" the next inquiry is,—what effect had the act of 1841, chapter 262, on that legislative power?

The first section of the act provides, that from and after its passage, "the chancellor or any court of this State, as a court of equity, shall have jurisdiction of all applications for divorces," and the second section specifies the grounds on which divorces *a vinculo matrimonii,* may be granted. They are, first, the impotence of either party at the time of the marriage; secondly, for any cause, which, by the laws of this State, renders a marriage null and void *ab initio;* thirdly, for adultery; fourthly, where the party complained against has abandoned the party complaining, and has remained absent from the State five years. By the act of 1844, chapter 306, the courts are authorised to decree divorces in cases where the abandonment has continued uninterruptedly for three years.

It is contended on the part of the appellant, that this legislation divested the General Assembly of all power over the subject, and gave an exclusive jurisdiction to the chancellor and

the county courts, sitting as courts of equity. In this view, we do not concur.

The delegation of authority to the courts to act in certain enumerated cases, does not necessarily involve the negation of a reservation of power to the legislature to act either in the same or in other and a different class of cases. The acts of 1841 and 1844 were, at all times after their passage, subjects of legislative revision and repeal. It was competent for that branch of the government to repeal them in whole or in part, or to suspend, for a time, their operation. Whenever, therefore, the legislature granted a divorce for any of the causes mentioned in those acts, they were *pro tanto* repealed. Except in the case of a grant or other contract there is no constitutional power residing in one legislature to limit the power of succeeding legislatures. Within the purview of the constitution—with the exception we have mentioned—all legislatures are co-equal; what one may do a succeeding one may also do or undo. If this were not so, in the very nature of things, it would be within the power of the legislature at one session to exhaust or part with the whole law-making power of the State. The organization of society, no less than the constitution, contemplates the existence of the legislative power as indestructible, and as co-existent with itself and the organic law.

The argument of counsel for the appellant sought to deduce from the case of *Crane vs. Meginnis,* principles in opposition to those which we have just announced. It was urged by them, that inasmuch as the legislature, in the year 1777, authorised the chancellor to hear and determine all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of England in the ecclesiastical courts there, and inasmuch as the court determined that part of the act of 1823, which gave alimony to the wife, to be unconstitutional, by a parity of reasoning, since the act of 1841, such an act as that of 1849, divorcing the appellee from her husband ought to be regarded and held as unconstitutional and void. We think the learned counsel have whol-

57    v.2

ly misconceived the grounds of the decision of the court in that case. After disposing of the question involving the right of the legislature to grant divorces, they observe, "the suit for alimony in this State, as in Great Britain, is a distinct remedy from the proceedings to obtain a divorce, and for a series of years the wife's maintainance has been recoverable through the intervention of our judicial tribunals;" and they go on to remark, that so early as the year 1689, in the case of *Galwith vs. Galwith*, 4 *Har. & McHen.*, 477, it was asserted in the supreme court of the province, that alimony is only recoverable in chancery or the court of the ordinary. The court evidently regarded the act of 1777 as but affirming the law of remedy as it had previously existed; declaring the allowance of alimony always to have been a *judicial*, and the granting of divorces within this State, as a regular exercise of legislative power. See also, *Helms vs. Franciscus*, 2 *Bland's Ch. Rep.*, 566.

Whilst we have no doubt on the general proposition, that the legislature, since the passage of the act of 1841, possessed the power to divorce man and wife, it is manifest under the statement of facts in the case now before us, that we must regard the act of 1849 as constitutional and valid.

Independently of the acts conferring jurisdiction on the courts in matters of divorce, the power of the legislature has not been questioned. And it has not been contended that the acts of 1841 and 1844 conferred on the courts jurisdiction in cases other than those *specifically enumerated in them*. Now this case comes before us on a case stated, and it is not allowed to this court to draw inferences of fact from those contained in the agreed statement, no such power having been given by the assent of the parties.

The act of 1849, divorcing the parties, nowhere states the grounds on which the legislature passed it. It is true, the statement of facts shows, that the wife, in her petition, alleged the adultery and desertion of her husband for several years. Now were it even conceded, that the legislature had parted with all jurisdiction in cases like those enumerated in the acts

of 1841 and 1844, *non constat* the case in which it acted was of that character. The desertion may have been for a number of years less than that for which the courts are empowered to grant a divorce *a vinculo*, and if so, in any aspect of the argument of the counsel for the appellant, the legislature had jurisdiction of the subject. In the absence of all evidence to the contrary, we are to assume the action of a co-ordinate branch of the government has been within the limits prescribed by the constitution.

But, it is said, however this may be, the act is nevertheless null and void, because no notice was given to the husband of the application of the wife to the General Assembly. The acts of 1829, chapter 202, and 1840, chapter 238, authorise *notice to be given to the party whose marital relations are proposed to be changed.* So far as they are concerned, the observations we have made in regard to the repeal *pro tanto* of the act of 1841, are equally applicable to them. But, the objection to which we now refer is founded on a different principle; that is, that it would be contrary to the first principles of justice to bind a person by an action, when he had no notice any such was in contemplation. As a general proposition this is undoubtedly true, and accordingly it has been held, that a party cannot be *personally* bound by a judgment when he has not been summoned or had notice of the proceeding. *Kilburn vs. Woodworth*, 5 *Johnson*, 37. But the rule is different where the judgment operates *in rem.* It is also true, that all judgments rendered in any court against a party who had no notice of the proceeding are void, and that sentences obtained by collusion are mere nullities, and that all other courts may examine into facts upon which a judgment has been obtained by fraud. 2 *Kent*, 108. The case, however, of legislative action is entirely different. If the passage of a particular act be but a *"regular exercise of legislative power,"* notice is unnecessary. The legislature may, of its own motion, without suggestion from, or to any other body or person, exercise the power with which it is endowed by the constitution. In this particular the exertion of its

powers is distinguished from that of those of the judicial branch of the government.

By the 21st section of the bill of rights of Maryland of 1776, it was declared: "That no free man ought to be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the law of the land."

Under this section of the bill of rights a person may be imprisoned, disseized of his freehold, &c., *provided it be done by the judgment of his peers, or by the law of the land.*

The words by "the judgment of his peers," mean a trial by jury, and the words "by the law of the land," which are copied from *Magna Charta,* are understood to mean due process of law, according to the course and usage of the common law. 2 *Kent's Com.,* 13. 9 *Gill and John.,* 412. 1 *Maryland Ch. Decisions,* 252. By the third section of the bill of rights, the inhabitants of Maryland are declared to be entitled to the common law of England, "subject nevertheless to the revision of, and amendment or repeal by, the legislature of this State." And by the sixth section of the same instrument it is said, "the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other." The evident purpose of the declaration last quoted, is to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority. That is to say, such of them as are judicial in their character to the judiciary; such as are legislative to the legislature, and such as are executive in their nature to the executive. Within the particular limits assigned to each, they are supreme and uncontrollable. If therefore it be but a "*regular exercise of legislative power*" for the General Assembly to pass an act of divorce, it is not within the authority of the judiciary to pronounce its action in the premises null and void. In the passage of such an act, the legislative branch of the government but announces its will as it is authorised to do by the constitution, and there its

power ceases. The legal consequences flowing from such a legislative declaration it is for the judiciary to determine. The legislature has annulled the marriage of the parties to this suit. This we have seen they had the constitutional right to do. It has not undertaken to deal with questions of property; if it had attempted to have done so, such attempt would have been an assumption of power unauthorised by the constitution. It has simply divorced the parties. All questions involving rights to property, they have submitted to the judicial branch of the government for its ascertainment. When the interposition of that authority is invoked, as it is in this case, the parties are entitled to be heard and to have their respective rights ascertained, according to the due course of the "law of the land."

This being so, the question is, what are the rights of the former husband of the appellee?

The statement of facts informs us, that the appellee before, and at the time of her marriage, was seized in fee of the land in question, and that her former husband never had, nor has he now, any interest in the land, other than such right or possession as he acquired by virtue of his marriage. It also is admitted there was no issue of the marriage.

In regard to the rights of either the husband or wife after divorce, we are not enlightened by any decisions on the subject in England since parliament assumed and has exercised the power to annul marriages, and the reason of this, as we are told by *MacQueen on Husband and Wife,* 210, (59 *Law Lib.,* 138,) is, that it is the settled usage of parliament to introduce certain clauses, which may be called property clauses, in order to regulate the rights and liabilities of the parties after the nuptial tie has been dissolved.

In *vol.* 1, *chapter* 1, *page* 3 *of Roper on Husband and Wife,* it is said, "by the intermarriage the husband acquires a freehold interest during the *joint lives* of himself and wife, in all such freehold property of inheritance as she was seized of at that time, or may become so during the coverture."

This is undoubtedly true, if the author is to be understood

as meaning that he becomes so entitled *in right of the wife* so long as the coveture lasts; but if he is to be understood as asserting, that by virtue of the marriage alone he acquires a freehold estate in *his own right* for the joint lives of himself and wife, regardless of the cessation of the coveture, we do not concur with him, nor do the authorities upon which he relies sustain him. Among them is *Coke Litt*, 351, where Lord Coke quaintly observes: "It is good to be seen what things are given to the husband by marriage. First, it appeareth here by Littleton, that if a man taketh to wife a woman seized in fee, he gaineth by the intermarriage an estate of freehold *in her right*, which estate is sufficient to work a remitter, and yet the estate which the husband gaineth dependeth upon uncertaintie, and consisteth in privitie, for if the wife be attainted of felony, the lord, by escheat, shall enter and put out the husband, otherwise it is if the felony be committed after issue had. Also, if the husband be attainted of felony, the king gaineth no freehold, but a pernancie of the profits *during the coverture*, and the freehold remaineth in the wife." And in the same book, page 67, it is said, if the husband "hath issue by his wife, then he shall receive homage alone during the life of his wife, and the reason is, because he, by having of issue, is entitled to an estate for term of his own life, in his own right, and yet is seized in fee in the right of his wife, so as he is not a bare tenant for life. But if his wife die, then he hath only but an estate for life, and then he cannot receive homage."

It is thus seen that the estate which the husband takes exists in *privity*, and when this ceases the estate must necessarily cease with it. Again, in the case put by Lord Coke, where the husband be attainted of felony, the king gains no freehold, but a mere pernancy *during the coverture;* when this ceases there can be no freehold in the husband nor any pernancy of the profits. And in *Greneley's case*, 8 *Coke*, 72, it was held under the words of 32 *Henry* 8, *chap.* 28, which provided, that no fine, feoffment, or other act by the husband only, of any manors, lands, &c., of the inheritance or freehold

of his wife, *during coverture*, should make any discontinuance, or be prejudicial to the wife or her heirs, by the death of such wife, but that issue of their two bodies might enter, that in all cases where the wife might have a *cui in vita* at common law, she should enter by force of the statute. And it is there expressly said, "if the husband aliens, and afterwards is divorced *causa præcontractus*, or any *other* divorce which dissolves the marriage *a vinculo matrimonii*, there the wife *during the husband's* life may enter; for the words of the act are, no fine, feoffment, &c., during *coverture* between them. And although the statute saith, 'but that the same wife,' &c., that is to be intended of her who was his wife at the time of the alienation; for when the husband dies, she is not then his wife, but she is called wife to describe the person only who shall enter; and it is not said in the statute that the wife shall enter after the death of her husband, but generally that she shall enter 'according to their right and title,' be it in the life of the husband after a divorce *a vinculo matrimonii*, or after his death."

Now, if the interest of the husband be existent only during coverture, then, it is clear, a divorce *a vinculo matrimonii*, restores the wife to her estate as she had and enjoyed it prior to her marriage. It is supposed, however, that the case of *Stephens against Totty*, reported in *Croke Elizabeth*, 908, establishes a different doctrine. The reverse is precisely the case. It was decided in that case, if a husband and wife are divorced *a mensa et thoro*, and a legacy is left to her, the husband may release it. Such a divorce was held not to dissolve the marriage absolutely, as would be the case of a divorce *a vinculo matrimonii*, and it was on this consideration held that the wife's legacy could be released by her husband, the divorce *a mensa et thoro* being nothing more than a separation.

The doctrine which we have announced, has been held and recognised in the courts of several of the States of this Union.

In the case of *Gould vs. Webster*, 1 *Tyler*, *(Vermont,)* 414, decided in 1802, the Supreme Court of Vermont declared the operation of a divorce *a vinculo matrimonii* to be, to restore to the woman her interests entire in all the real estate which

the husband held in her right by the intermarriage, and which by their joint act had not been legally conveyed during the coverture. And the same doctrine is held in *Mattocks vs. Stearns and Wife,* 9 *Vermont,* 326. *Starr vs. Pease and others,* 9 *Connecticut,* 541. *Wheeler vs. Hotchkiss,* 10 *Connecticut,* 225. *Barber vs. Root,* 10 *Mass.,* 260. In the State of Massachusetts there was in force at the time the decision reported in 10 *Mass. Reports* was made, a statute which authorised it, but the court held the doctrine independently of the statute.

On the whole we are of opinion, that the legislature was constitutionally competent to pass the act of 1849, and that the legal effect of that act was to restore to the wife the real estate of which she was seized at the time of the marriage, and which had not been conveyed away during *coverture* by the joint act of herself and husband.

It may not be deemed, it is to be hoped, officious for us to remark, that legislation on the relative rights of divorced persons might be very properly had. We can very readily perceive that cases may arise in which it would be but sheer justice to secure to the husband the pernancy of the profits of the whole, or of a portion of the estate of the wife. This, however, is a question for the disposition of another branch of the government, we can only decide it according to the law as we find it.

*Judgment affirmed.*