(Decided October 21st 1864.)

---

## SAMUEL G. MILES *vs.* AUGUSTUS W. BRADFORD, GOVERNOR OF MARYLAND.

MANDAMUS.—Where the act to be done requires the exercise of judgment and discretion in the officer against whom a *mandamus* is prayed, it will be refused.

THE CHIEF MAGISTRATE OR GOVERNOR OF THE STATE, bears the same relation to the State that the PRESIDENT does to the United States, and in the discharge of his political duties, is entitled to the same immunities, privileges and exemptions.

Miles *vs.* Bradford, Governor of Maryland.

The acts of the Governor of the State in the exercise of the powers and per-
formance of the duties devolved upon him by the Act of 1864, ch. 5, are
not subjects of appeal, and the judiciary have no control or revisory powers
in respect thereto.

APPEAL from the Equity side of the Superior Court of
Baltimore City:

This appeal was taken from an order of the Superior
Court of Baltimore City, dismissing a petition of the pres-
ent appellant, asking that a rule be laid on the Governor
to show cause why a writ of *mandamus* should not be
issued against him, commanding him, as set forth in the
prayer of the petition, the substance of which is stated in
the opinion of this Court. The object of the proceedings
as stated in the petition, was "to obtain an exposition of
the rule of law which ought to guide the discretion of the
Governor in his ascertainment of the result of the election
had for the adoption or rejection of the present Constitu-
tion."

The petition also states that the petitioner resided in
the City of Baltimore and according to the form and effect
of the present Constitution was entitled to vote at all
elections held therein; that at the said election held in
said city, he tendered his ballot "Against the Constitu-
tion," which was received by the judges; but that they
determined it was not a legal vote, and deposited it
in another box, procured and prepared for the deposit
therein and safe-keeping of rejected ballots; and that the
ground of rejection was the refusal of the petitioner to
take the oath prescribed by Art. XII, sec. 8, of the New
Constitution.

The petition further alleged that other ballots were
received from other legal and qualified voters,—but were
rejected on the same ground and, in like manner, de-
posited in boxes for rejected ballots; that the boxes, for
rejected ballots, were sealed up after the election, and
were at the disposal of the Governor; that the votes thus

rejected and disposed of were sufficient in number to have changed the result of the election, and should therefore have been counted; but that the Governor had declared his purpose to disregard them and to limit himself to the ascertainment of the result, as shown by the returns made by the judges of election.

The petition further alleged, that upon the returns of the "Home vote," the majority was largely against the New Constitution; but that returns had been made of votes cast beyond the limits of the State of Maryland, by persons claiming to be in the military service of the United States, and that the Governor had avowed his determination to include the votes thus cast in his enumeration; and that, if those votes were counted it might be adjudged that the New Constitution had been adopted, whereas, if they were rejected, as it was insisted they should be, the New Constitution would have been rejected. It was further alleged that the oath prescribed by the New Constitution was not tendered to, or taken by the soldiers, as the New Constitution required it should be.

Other objections to the conduct of the election, and to the returns, were stated in the application, but were not relied on in this Court.

The Court below, (MARTIN, J.,) by the order passed October 24th, 1864, decided that no sufficient ground was stated in the petition for the interposition of the Court, and passed an order dismissing said petition; from which order the petitioner appealed.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, and COCHRAN, J.

*Thos. S. Alexander* and *I. Nevett Steele*, for the appellant.

In support of the present appeal it will be insisted:

1st. That the New Constitution can have no legal effect

and operation until after and in virtue of the ratification and adoption thereof by the people of the State. And by the people of the State are intended the constituency in whom resided the elective franchise at the moment of submitting the New Constitution to the popular vote. *Manly vs. The State,* 7 *Md.,* 147. *Constitution of* 1776, *Art.* LIX. Acts 1809, ch. 83; 1810, ch. 33; 1840, ch. 346. *Constitution of* 1851, *Art.* X. sec. 10. Act 1864, ch. 5.

2nd. As a corollary from the foregoing position, the New Constitution ought to have been submitted to the votes of the persons in whom the elective franchise resides by Art. I, of the present Constitution, and that franchise ought to have been exercised in manner and form as prescribed by the same article. The practical consequences, resulting from this corollary, are:

3rd. That the Convention of 1864, had no authority to exact the oath prescribed by Art. XII. of the New Constitution to be taken by all persons offering to vote at the election for adoption or rejection of the New Constitution. It may be fairly argued that, by reason of this unwarrantable effort to exclude from the exercise of the elective franchise, a portion of the constituency in whom it unquestionably resided, the entire instrument called the New Constitution is a nullity. But the present applicant contents himself with asking that the ballots actually tendered by persons duly qualified by the present Constitution, and received by the judges, but excluded from the returns on the ground only that the persons so tendering their ballots had refused to take the obnoxious oath, so far as said ballots are at this moment accessible, shall be counted by the Governor, in his ascertainment of the result of the election.

4th. That the votes cast by persons at places other than the election districts or precincts or places within the State wherein those persons respectively have their residences, and were duly qualified to vote by the present Con-

stitution, on the day of election, are to be excluded by the Governor. This point if maintained, will exclude the entire vote cast by persons in the military service of the United States.

5th. It may be argued that the popular vote in favor of the call of a Convention, and the election of delegates to the Convention amounted to a ratification and adoption of all the provisions contained in the Act of 1864, ch. 5, by which the Convention was called. And it must be confessed that as a general proposition this view may derive support from 6 *Cush.*, 573. But there is a clear distinction between the effect of an act submitted for the adoption of the entire body in whom resides the elective franchise, and the effect of an act submitted to the votes of a part only of that constituency. And it may be fairly argued that if the Act of 1864 in its provisions in regard to the election for taking the sense of the people upon the expediency of calling a Convention, or in regard to the election for the approval or rejection of the New Constitution, excluded from the election any portion of the constituency in whom the elective franchise is reposed, by the existing Constitution, or provided for the taking of said elections, or either of them, at places other than is prescribed by the present Constitution, the entire Act is void of legal effect. But it will not be necessary to press this argument. The hypothesis which we are to consider assumes as its basis that the Act of 1864 in all its provisions has been adopted by the people, and gives law to the Convention, and defines the limits within which the Convention may fairly act and beyond which its authority may not extend. Hence:

6th. The Convention had no authority to provide for the holding of any election beyond the limits of the State, or at any places within the State, other than those provided by the present Constitution and laws made pursuant thereto; since, the 6th section of the Act of 1864, ch. 5,

whilst it gives power to the Convention to submit the question of ratification or rejection of the New Constitution "at such time, in such manner, and subject to such rules and regulations as the said Convention may prescribe," is entirely silent with reference to the places for holding said election; and the same section also enacts that the provisions thereinbefore contained for the holding of the elections provided in the previous sections of the Act shall be applicable to the election to be held under this section; and by sec. 1, it is provided that the previous elections shall be held at the same places where the polls are by law held, in the several counties and the city of Baltimore, for the election of delegates to the General Assembly.

7th. And in like manner the Convention had no authority to add new disqualifications unknown to the present Constitution, as it has affected to do by imposing a new oath to be taken by the person offering to vote, and directing his ballot to be rejected on his refusal to take said oath; since the same section of the Act of 1864, provides that the New Constitution "shall be submitted to the legal and qualified voters of the State for their adoption or rejection;" and that the provisions thereinbefore contained for the qualification of voters shall be applicable to said election. Now the only provision of this class is to be found in the second proviso of the first section of the Act. The judges are here required "to administer the oath to every person offering to vote, whose vote shall be challenged on the ground that such person has served in the rebel army, or has either directly or indirectly given aid, comfort or encouragement to those in armed rebellion against the government of the United States, or is for any other reason not a legal voter, in the manner and form provided by sec. 21 of Art. 35 of the Code of Public Laws, relating to elections; and by the Code "the judges of election may administer an oath in any inquiry

they may deem necessary to be made, touching the right of any person offering to vote.''

These provisions of the Act of 1864, ch. 5, and of the Code, do not justify the Convention in directing the judges of election to administer to every person offering to vote, the oath prescribed by Art. I. sec. 4, of the New Constitution, to wit: ''I do swear that I am a citizen of the United States; that I have never given any aid, countenance or support to those in armed hostility to the United States;— that I have never expressed a desire for the triumph of said enemies over the arms of the United States; and that I will bear true faith and allegiance to the United States, and support the Constitution and laws thereof as the supreme law of the land, any law or ordinance of any State to the contrary notwithstanding; that I will in all respects demean myself as a loyal citizen of the United States; and I make this oath without any reservation or evasion, and believe it to be binding on me.''

8th. By the provisions of the New Constitution, the oath is directed to be administered to all persons offering to vote, without exception. Assuming it to be validly imposed, it ought to have been taken by persons in the military service as well as others, and their votes must be excluded unless it shall appear affirmatively that the persons so voting did take the oath prescribed.

9th. In reference to the remedy:

The duty of counting the votes cast at the late election, and ascertaining the result, is purely ministerial, and such as could be performed by any matron of any high school in the City of Baltimore, as well as by the Governor of Maryland.

It is not a duty peculiarly appropriate to the office of Governor, but might have been delegated to the President or Secretary of the Convention, or to the Secretary of State,—all of whom may be restrained or controlled in the exercise of a ministerial duty by the judiciary, and by

Miles *vs.* Bradford, Governor of Maryland.

its process of *mandamus*. And if it is assumed that a *mandamus* will not lie to the Governor to assist or to control him in the exercise of a ministerial duty, then it will be insisted that the effort to delegate to such an irresponsible personage, an office so purely ministerial, but accompanied with the conditions which, if observed, may be attended with most disastrous consequences to the political rights, and rights of property of the people of the State, must be abortive, and the exercise of any such delegated authority by the Governor must be a nullity. But it will be further insisted as the conclusion from all the cases, and as the dictate of principle, that the judicial department may by *mandamus*, assist the Governor in the exercise of a ministerial function, so far as to state the legal principles by which, in such case, he is to be governed. Within the limits of the authority conferred on him by the Constitution, or laws pursuant to the Constitution, the Governor acts without restraint. But if a General Assembly or a Convention affects to delegate to him an authority which it cannot lawfully delegate, then such delegation in so far as it exceeds the legal competency of the constituent body, is inofficious and void. And it is a fallacy to affirm that the Governor, in the attempt to exercise such unlawful delegation, acts *virtute officii*, or that the judicial power, in defining the line between the power which is lawfully delegated, and the excess, trenches upon the independent exercise of the Executive power. *Marbury vs. Madison,* 1 *Cranch,* 145. *Kendall vs. United States,* 12 *Peters,* 595. *Lowe vs. Towns,* 8 *Ga.,* 379. *State vs. Chase,* 5 *Ohio N. S.,* 528. *State vs. Governor,* 1 *Dutch.,* 331. *Dennett, Petitioner,* 32 *Maine,* 508. *People vs. Bissell,* 19 *Ill.,* 229. *Hawkins vs. The Governor, &c.,* 1 *Pike,* 570. 1 *Kent Com.,* 278. *Chase vs. Miller,* 41 *Pa. R.,* 404, 416, 418. *Bonner vs. State of Ga.,* 7 *Ga. R.,* 480, 481. *Opinion of Justices, &c.,* 6 *Cush.,* 573. *Collen vs. Ellis,* 7 *Jones' Law*

23    v. 22.

*Rep.*, (*N. C.*,) 549. *Pacific R. R. Co. vs. Governor*, 23 *Mo.*, 360, 361. *Strong, Petitioner, &c.*, 20 *Pick.*, 495. *Commonwealth vs. Dennison*, 24 *How.*, 98, 106, 109.

10th. The more appropriate tribunal for the commencement of this proceeding, is the Circuit Court of Anne Arundel County,—within whose jurisdiction is to be found the seat of government and the constitutional residence of the Governor. But at the moment of making the application in the case, the office of judge of that Court was vacant by the death of the late incumbent. And it is averred that the Governor is frequently in Baltimore, and has in that city a public office, wherein he transacts much of his official business. It becomes necessary therefore in order to prevent a failure of justice that the application should be made to the Superior Court of that city.

It will be insisted that under the circumstances, the Superior Court had jurisdiction, and ought to have granted the rule as asked. It will be observed that the Court places its dismissal of the petition on the absence of merits and not on the ground of defect in jurisdiction. At the same time it must in justice to that learned Court be stated that nothing whatever was said about jurisdiction, and that the counsel pressed for a decision, avowing his willingness to accept the judgment suggested by the the first impression made by his case on the judgment of the Court.

*H. Winter Davis*, for the appellee.*

The proceeding in this case is without precedent in the

---

*Note.—The Governor of Maryland having declined to recognize the authority of the Court to control his official action, in the matter in controversy, by appearing in the case by counsel, and putting in his defence, the Hon. H. Winter Davis and Henry Stockbridge, Esq., on behalf of the friends of the New Constitution, appeared at the hearing, and were admitted by the Court as *amici curiæ*, to argue the case, as for the appellee. The necessity of immediate argument prevented their filing the usual brief, and the subsequent lamented death of Mr. Davis has deprived the reporter of the means of furnishing more than a meagre and imperfect sketch of his very able argument. N. B.

books, and probably in the cognizance of the Court. The petitioner sues for the public, the people, not the voters simply, but the whole people.

I hold it to be incompetent for the Judicial Department of the Government to restrain by injunction, or direct by *mandamus*, the co-ordinate Executive Department. This Court would not pretend to issue a *mandamus* to the Legislative Department, commanding them to pass a law contemplated by the Constitution; nor would they attempt by *mandamus* to compel the Governor to call out the militia; or direct him as to their movements when called out, nor by *injunction* to prevent his calling them out.

What is the question to be decided? Not what is the right construction of the Old or New Constitution or the Act of 1864, but what is the ascertained will of the people. The Constitution of 1864 is not to execute that of 1851, but to declare anew the will of the people. Such has ever been the case in Maryland. The Constitution of 1776 went so far as to name the judges of election. The Constitution is to judge of and define its own powers.

It is argued for the petitioner, that the duties and powers devolved upon the Governor, by the Act of 1864, are purely of a ministerial character, and that this Court may therefore direct and control that high official with respect thereto. But some of those duties are clearly judicial and not ministerial, as the counsel of the appellant indirectly admit when they speak of the Governor's being required to decide a question of law—which certainly implies the exercise of discretion. Upon this question we refer to *Wheaton et al. vs. Peters et al.*, 8 *Peters*, 602, 603. *Marbury vs. Madison*, 1 *Cr.*, 169 to 171. *Kendall vs. United States*, 12 *Peters*, 609, 610. *Decatur vs. Pauline*, 14 *Peters*, 515. *Brashear vs. Mason*, 6 *How.*, 101, 102. *Luther vs. Borden*, 7 *How.*, 1. Upon this point, however, the appellant's counsel have *stated* themselves

out of Court, when they say their object is to "guide the *discretion* of the Governor."

The Court are now asked to intervene between the people of Maryland engaged in changing their organic law, and the Governor of Maryland, about to declare what has been the action of the people.

*Henry Stockbridge*, also for the appellee.

The Convention which framed the New Constitution was a *sovereign* Convention, and *ex necessitate rei* clothed with power to declare its own action. If in the exercise of its sovereign powers it had required the election returns on its adoption or rejection to be made to the Convention itself, re-assembled for that purpose, thereafter, in pursuance of previous adjournment, no tribunal in the State could have restrained it from counting the votes and proclaiming the adoption of the Constitution.

This necessary declaratory power, it could delegate to an agent, and *pro hac vice* clothe him with its own sovereignty. It saw fit so to delegate it, and selected the Governor as that agent—the mouth-piece or organ of the Convention for declaring the people's will.

If the sovereign Convention could not be restrained by injunction, no more can its agent thus, and for such purpose, constituted.

It is not the proclamation which gives vitality to the Constitution. Its vitality is derived from the act of the people, not from the declaration of that act. No department of the Government has power to obstruct or restrain the people in the legal expression of their will, or restrain the legal declaration of that will; when the people have exercised it.

But, if it were otherwise, and the duty were one imposed upon the Governor by mere legislative enactment, no other department could intervene to command, or forbid the exercise of that power by the Executive Department.

Miles *vs.* Bradford, Governor of Maryland.

Government as a whole, is the visible expression of the people's sovereignty; and in America they have uniformly distributed the powers of the Government among co-ordinate departments. *Duer on Const. Jurisp.*, 21. *Dec. of Rights of Md.*, Art. 6.

There being no subordination as between the Departments, neither has power to control any other. The right to command necessarily, implies a superior and an inferior; and superiority and inferiority cannot consist with co-ordination. The safety of the people—the very existence of the Government—depends upon the harmonious co-operation of the different co-ordinate departments.

The different departments operate in different spheres; and each within its own peculiar sphere wields the whole sovereignty of the State. Outside its own peculiar sphere each is powerless.

The Legislative department enacts laws; the Judiciary expounds them; the Executive enforces them. Neither can do anything else. The Legislative cannot command the Judiciary; the Judiciary cannot command the Legislative or the Executive.

Suppose the Judiciary had the right to command the Executive, where rests the power to enforce obedience to the command? The Executive commands the military power of the State. The Court could only act through the Sheriff or *posse comitatus.* If that were insufficient, it has no resource but to appeal to the very power which is disobeying its command, and resisting their operation, to enforce obedience to them.

Where Courts have a clear right to command, they never exercise the right unless they also "have power to use coercive means to compel obedience." *Commonwealth of Ky. vs. Dennison, (Gov.)* 24 *How.*, 66. *Lowe vs. Towns, (Gov.)* 8 *Ga. Rep.*, 362, 372.

There has been no case in which a *mandamus* has actually issued against the Chief Executive officer of a State.

At the most, the cases cited, to sustain the power contain but judicial *dicta*, not decisions.    While in some instances claiming extravagant powers, as matter of fact, the Judges have not done the act.    The *mandamus* against an Executive has not been ordered.    Where it has issued against a ministerial officer commanding him to perform a ministerial act the Courts have carefully discriminated between the minister and the Executive.    *Marbury vs. Madison*, 1 *Cranch*, 137.    *Kendall vs. United States*, 12 *Pet.*, 524, and cases above quoted.

Political reasons alone, are enough to constrain the Judiciary to desist from any attempt to control the Executive.    *Hawkins vs. The Governor*, 1 *Ark. Rep.*, 570. *Mayor, &c., Garnishees vs. Root,* 8 *Md. Rep.*, 95.    *Debates of Convention of* 1864, *pp.* 765–7.    *Garcia vs. Lee*, 12 *Pet.*, 511.    *Foster vs. Neilson*, 2 *Pet.*, 253.    *Cherokee Nation vs. State of Georgia*, 5 *Pet.*, 1.

Bowie, C. J., delivered the opinion of this Court.

The peculiar circumstances surroundingt his case requiring it should be promptly decided, we have only time to announce the conclusions arrived at, and refer to a few of the leading authorities on which they are based.    The case has been argued with an admirable spirit of courtesy and moderation, and much eloquence and learning.

The brief of the relator's counsel states:—"The object of the proceedings is to obtain an exposition of the rule of law which ought to guide the *discretion* of the Governor in his ascertainment of the result of the late election had for the adoption or rejection of the 'New Constitution.'"

The relator's prayer is substantially, that the Governor of Maryland show cause "why a writ of *mandamus* ought not to be issued, commanding him in ascertaining the number of votes cast at the said late election held as aforesaid," to count certain votes which were tendered and rejected, and to exclude certain votes which shall appear

to have been cast at any place other than the election precinct, at which the person voting was qualified to vote.

From this brief analysis, it appears the proceeding is one of the most momentous consequence, and should be treated with the greatest deliberation. Our first duty is to inquire whether it is a proper subject for judicial interpretation and interposition. By our organic law, the powers of government are distributed into Legislative, Executive and Judicial. We are admonished by the Declaration of Rights, that these powers "ought to be forever separate and distinct from each other, and no person exercising the functions of one of said departments, shall assume or discharge the duties of any other."

The 2nd Article of the Constitution is, "the Executive power of the State shall be vested in a Governor," * *,*. "He shall take care that the laws be faithfully executed."

The 6th section of the Act of 1864, ch. 5, known as the Convention Law, required the Constitution and form of Government adopted by the Convention to be submitted to the legal and qualified voters of the State for their adoption or rejection, at such time, and in such manner, and subject to such rules and regulations as said Convention may prescribe; and the provisions thereinbefore contained for the qualification of voters and the holding of elections, provided in the previous section of the Act, were made applicable to the election to be held under that section.

The 8th section further enacts that when the Governor shall receive the returns of the number of ballots cast in the State for the adoption or rejection of the Constitution submitted by the Convention to the people, if upon counting and casting up the returns as made to him as hereinbefore prescribed, it shall appear that a majority of the legal votes cast at said election are in favor of the adoption of the said Constitution he shall issue his proclamation to the people of the State, declaring the fact, and he shall take such steps as shall be required by the said Con-

stitution to carry the same into full operation, and to supersede the old Constitution of the State.

Is the power and authority conferred on the Governor by this Act, a political or judicial power? A late eminent jurist whose recent death has been lamented as a national calamity, in the case of *Luther vs. Borden,* 7 *How.,* 1, expressed himself thus strongly: "Certainly the question which the plaintiff proposed to raise by the testimony he offered, has not heretofore been recognized as a judicial one in any of the State Courts. In forming the Constitutions of the different States, after the Declaration of Independence, and in the various changes and alterations which have since been made, *the political department has always* determined whether the proposed Constitution or amendment was ratified or not by the people of the State, and the judicial power has followed its decision. Courts of law will not interfere with the exercise of high *discretionary* powers vested in the Chief Magistrate of the State: for obvious political reasons; among others,—because, as Governor of the State, deriving his powers from the Constitution thereof, he has been made a co-ordinate, separate, distinct and independent department of the Government."

In the case of *Lowe vs. Towns, Gov. of Ga.,* 8 *Ga. Rep.,* 372, the Supreme Court of that State said: "The ultimate effect of this remedy (*mandamus*) in case of refusal by the Governor to obey the laws of the land, would be to deprive the people of the State of the head of one of the departments of the Government.

Chief Justice MARSHALL in the case of *Marbury vs. Madison,* 1 *Cranch,* 145, says: "that the President is invested with certain important political powers, in the exercise of which he is to use his own discretion; and is accountable only to his country in his political character and to his own conscience."

The Chief Magistrate or Governor of the State, bears

the same relation to the State that the Presdent does to the United States, and in the discharge of his political duties is entitled to the same immunities, privileges and exemptions. *Vide Hawkins vs. The Governor, &c.*, 1 *Ark. Rep.*, 586.

Independently of all political considerations, if the question was a purely judicial one, this Court could not consistently with decisions in other States and in our own, grant the prayer of the relator. The general principle laid down in all these, almost without exception, is, that where the acts to be done require the exercise of judgment and discretion in the officer against whom the *mandamus* is prayed it will be refused. *Vide* cases in *Green vs. Purnell*, 12 *Md. Rep.*, 329. The result of these decisions is, that the duty and power to decide the questions, which we are now asked to determine, are devolved upon the officer or Governor without appeal, over whom in that respect, the judiciary have no control or revisory power.

We have thus succinctly announced the general principles which lead us to the adoption of the conclusion, that the order of the Superior Court in this case should be affirmed.

The Court has been invoked to enter into the constitutional powers of the Convention, and express opinions upon the validity of their acts, even if they should hold that the right to issue a *mandamus* did not exist, and they have been referred to the eminent examples of the Supreme Court through their Chief Justices in some cases, where they declared the law, although they could not enforce it. Without dwelling on the immense moral, political and legal influence of that tribunal, to which we cannot pretend, we respectfully suggest there is no parallel between the cases. Those cases in which the Supreme Court adopted that course, with one notable exception were not cases in which society was shaken to its foundations by civil discord, and parties arrayed against

each other with intense bitterness. If we cannot subdue the strife, we will not add fuel to the flame. All that we can do is, to show such reverence for Constitutional government, by confining ourselves to the strict limits of our authority, as may induce others, who love "liberty regulated by law," to cherish all its muniments, and observe all their obligations.

BARTOL, J., concurred in the ruling of the majority of the Court, affirming the order of the Court below, but filed the following separate opinion dissenting from certain of their conclusions:

I assent to that part of the opinion of a majority of the Court which denies the *mandamus* asked for, on the ground that the duties devolved upon the Governor by the Act of 1864, ch. 5, in ascertaining and announcing the legal votes upon the adoption or rejection of the proposed New Constitution, are not purely ministerial in their character; but that they require the exercise of judgment and discretion on his part, necessarily devolving upon him the duty of passing upon and deciding the various questions argued before us, and upon which we have been called upon to pass. In such case the law is well established that a writ of *mandamus* will not be granted. *Green vs. Purnell*, 12 *Md. Rep.*, 329, and the cases there referred to, and many other cases might be cited.

I do not agree, however, with my brothers in thinking the power devolves upon the Governor, now under consideration, is in any sense a political, executive power, belonging to him *virtute officii*, and not a proper subject for judicial investigation. That subject, however, having been submitted by law to the decision of the Governor, I forbear the expression of any opinion upon it.

*Order affirmed.*

(Decided October 29th 1864.)