606 A.2d 286

**James Francis O'HARA, III, et al.**

v.

**Jacqueline KOVENS, Personal Representative
of the Estate of Irvin Kovens, et al.**

**No. 1305, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 8, 1992.

Certiorari Denied Oct. 7, 1992.

**10**

Angus R. Everton (Roy L. Mason and Mason, Ketterman & Morgan, P.C., on the brief), Baltimore, for appellants.

Joseph M. McManus (Charles H. Fleischer, Clifton M. Mount, Ross Marsh Foster and Myers & Quiggle on the brief), Washington, D.C., for appellee, Casey.

Stuart R. Berger (M. Albert Figinski and Weinberg and Green on the brief), Baltimore, for appellees, Hess, Harry and William Rodgers.

H. Thomas Howell, William F. Gately and Semmes, Bowen & Semmes, on the brief, Baltimore, for appellee, Kovens.

Argued before MOYLAN, CATHELL and MOTZ, JJ.

MOTZ, Judge.

This appeal is the latest, and perhaps the final, chapter of the litigation arising out of the alleged impropriety involved in former Governor Marvin Mandel's 1971 veto of legislation to provide additional racing dates for a Maryland race track. Critical to determination of this case is resolution of the question of whether the former governor's motives for that veto can be examined by a court in a tort action against his alleged co-conspirators based on the veto. Because the separation of powers doctrine bars judicial inquiry into the former governor's motives for his veto, we affirm the order of the Circuit Court for Baltimore City (Friedman, J.) granting summary judgment to the alleged co-conspirators.

(i)

On November 22, 1978, appellants, James Francis O'Hara, III, and Michael Patrick O'Hara, individually and as guardians of the property of their mother, Josephine M. O'Hara (collectively "the O'Haras") filed a declaration against Marvin Mandel, a former governor of the State of Maryland, W. Dale Hess, Harry W. Rodgers, III, William A. Rodgers, Ernest N. Cory, Jr., Irving T. Schwartz, Eugene B. Casey, and Irvin Kovens (collectively "the defendants").[1]

In that declaration the O'Haras alleged a claim for "common law fraud and deceit."[2] They asserted that they were stockholders of Southern Maryland Agriculture Fair Association, Inc. ("Marlboro Race Track"), and that following indictments detailed in *United States v. Mandel*, 591 F.2d 1347, *vacated*, 602 F.2d 653 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1988), they discov-

---

1. Defendants Casey and Kovens died while this action was pending and representatives of their respective estates were substituted as parties defendant.

2. The declaration originally contained an additional count alleging a violation of the Maryland Securities Act. During this litigation, the O'Haras have conceded that the securities claim is barred by limitations. *O'Hara v. Kovens*, 305 Md. 280, 283 n. 1, 503 A.2d 1313 (1986). Accordingly, the only remaining claim is for common law fraud.

ered that "at some point between January 7, 1969 and May 28, 1971" the defendants had made representations and failed to disclose material facts in order to induce the O'Haras "to sell stock in the Marlboro Race Track at a lower price than if defendants had not made such representations or omissions." The O'Haras further allege that the defendants knowingly and intentionally, but secretly, conspired to do this and that the O'Haras relied upon the defendants' representations and omissions in determining to sell their stock.

In March 1971, House Bill 1128 was introduced in the House of Delegates for the purpose of obtaining the approval of the General Assembly for the permanent transfer of eighteen (18) racing days from Hagerstown Race Track to Marlboro Race Track. On May 28, 1971, former Governor Mandel vetoed House Bill 1128, allegedly "with the intent and the knowledge that his veto would depress the value of the stock of Marlboro Race Track and would deceive and defraud Plaintiffs and other owners of the stock of Marlboro Race Track about the value of their stock and the price that they could expect to obtain for the stock for sale on the open market."

Shortly thereafter, on June 1, 1971, defendant Schwartz "purported to buy fifteen thousand (15,000) shares of the Marlboro Race Track, at $7.00 per share" and on two subsequent occasions, purchased additional stock, buying a total of 2,000 additional shares. The O'Haras allege that on these occasions, Schwartz "acted to conceal the fact that he had no beneficial interest in the stock ... and that the true beneficial owner was" defendant Kovens. It was further alleged that by use of the name of defendant Cory, individually and as attorney, defendants "concealed the fact that they were, during 1971, seeking to acquire" the O'Haras' interest in the race track. In December 1971, the defendants "arranged for the purchase of the controlling interest in Marlboro Race Track [from the O'Haras] in such a way as to conceal their true identities as purchasers of the stock." During 1971 and thereafter, defendants used the

name of defendant Schwartz to conceal the fact that "defendant Kovens was the true beneficial owner of the additional financial interests purchased in Marlboro Race Track acquired on December 31, 1971."[3] On and after January 1, 1972, the defendants assertedly arranged for defendant Casey to represent himself falsely as the new owner of Marlboro Race Track, in order to conceal the financial interest of the other defendants in the race track. On January 7, 1992, Casey wrote a letter to all members of the General Assembly of Maryland to induce them to override then Governor Mandel's veto of House Bill 1128. Override of the veto, by providing the race track with eighteen (18) additional racing days, would markedly increase the value of the Marlboro Race Track stock.

Moreover, the defendants allegedly conspired with former Governor Mandel so that he would "by virtue of his office as Governor of the State of Maryland ... act with the intent to induce the legislature to override the veto of May 28, 1971." On January 12, 1972, the General Assembly did, in fact, override the veto, thereby permanently transferring to Marlboro Race Track the eighteen (18) racing days which formerly had been run at Hagerstown Race Track.

Finally, the O'Haras alleged that during 1972 and thereafter, defendants used defendant Cory and "the names of approximately seven (7) of their friends and family members in such a way to conceal the identity of the true beneficial owners of financial interest in Marlboro Race Track." Former Governor Mandel and the other defen-

---

**3.** The Court of Appeals noted that when the O'Haras sold their stock in December 1971, they "at least suspected that the undisclosed principals represented by Cory were persons with some political 'clout' who would attempt to have the General Assembly override the veto. Because the O'Haras were out of the Marlboro stock at a price which was satisfactory to them," they "could not have cared less who the specific purchasers were" or "if friends of Governor Mandel purchased Marlboro stock or had benefitted from the veto override." *O'Hara v. Kovens,* 305 Md. 280, 293, 503 A.2d 1313, (1986). It was, thus, not fraud in general, but apparently only fraud that might have disadvantaged them that concerned the O'Haras.

dants assertedly "used their efforts to induce the General Assembly of Maryland to pass the Race Track Consolidation Bill (Senate Bill 928 of 1972) the effect of which, as the defendants well knew, would be to further increase the value of Marlboro Race Track, theretofore, fraudulently acquired from Plaintiffs." In December 1972, the defendants caused the merger of the Marlboro Race Track with the Bowie Race Track, thereby further increasing the value of Marlboro Race Track stock, which they had assertedly acquired by fraud from the O'Haras.

On December 2, 1983, the Circuit Court for Baltimore City granted summary judgment to all defendants on the ground that this action was time-barred. On appeal, this court affirmed this order as to James and Michael O'Hara in their individual capacities, but reversed as to their claim on behalf of their mother's estate. *O'Hara v. Kovens*, 60 Md.App. 619, 484 A.2d 275 (1984). The Court of Appeals granted certiorari, vacated the grant of summary judgment, and remanded for further proceedings. *O'Hara v. Kovens*, 305 Md. 280, 503 A.2d 1313 (1986).[4]

Following remand, the Estate of Josephine O'Hara voluntarily dismissed with prejudice its claim against former Governor Marvin Mandel, and settled with the remaining defendants. In September of 1989, there was a jury trial solely on the issue of whether limitations barred the still-pending claims of James and Michael O'Hara in their individual capacities. During the trial, all defendants moved for judgment at the end of the plaintiffs' case and at the close of all evidence; those motions were denied. By special verdict, the jury found that limitations did not bar the claims because James and Michael O'Hara were not aware, and should not have been aware, before November 22, 1975, of any alleged wrong. Trial on the merits of the underlying claim was scheduled to begin on June 4, 1990.

---

4. The facts are more fully set forth in these earlier reported opinions.

On May 15, 1990, former Governor Mandel filed a motion to dismiss or for summary judgment on the ground that he was absolutely immune from liability. This motion was denied. Mandel then filed a notice of appeal and simultaneously filed a motion for stay of proceedings pending the appeal, accompanied by a petition for writ of certiorari to the Court of Appeals. On June 1, 1990, this court entered an order staying all proceedings in the circuit court pending final disposition of the appeal and the Court of Appeals entered an order issuing a writ of certiorari. On July 27, 1990, the Court of Appeals, in a comprehensive opinion, reversed the order denying Mandel's motion for summary judgment and remanded the case for judgment in his favor. *Mandel v. O'Hara*, 320 Md. 103, 576 A.2d 766 (1990). The court held that "as a matter of Maryland common law ... a Governor of Maryland enjoys an absolute immunity from liability for damages for nonconstitutional torts based on the approval or veto of legislative enactments." 320 Md. at 134, 576 A.2d 766. The mandate of the Court of Appeals was issued on September 5, 1990. As part of the mandate, the stay issued on June 1, 1990, by this court, was lifted.

On March 14, 1991, the remaining defendants filed a motion to dismiss or for summary judgment on the grounds that:

(1) As a matter of law, the common law fraud claim was legally insufficient because it necessarily requires judicial inquiry into motives for a valid legislative act, which inquiry is forbidden by the separation of powers doctrine embodied in Article 8 of the Maryland Declaration of Rights.

(2) As a matter of law, the common law fraud claim was legally insufficient because the allegations and undisputed facts failed to show any fraudulent misrepresentation or concealment of any material fact on which plaintiffs relied.

(3) As a matter of law, punitive damages cannot be recovered from the estate of a deceased person and, to

that extent, the claim against the personal representative of the late Irvin Kovens must be dismissed.

On April 1, 1991, Judge Kathleen O'Ferrall Friedman of the Circuit Court for Baltimore City entered an order granting summary judgment to all defendants on the basis of the first ground set forth above. Judge Friedman carefully explained the rationale for her decision as follows:

> Inherent in the issue of deceit is the Governor's motive in vetoing the legislation. Absent evidence of an improper motive on the Governor's part, there can be no deceit proven. Thus, the motive of the Governor is a material fact which cannot be separated from the deceit. However, the separation of powers doctrine prevents the judiciary from passing judgment on the Governor's motives for exercising a legislative function.

> Courts cannot be vested with the power to perform non-judicial functions in violation of the separation of powers doctrine. Because the court cannot inquire into or second-guess the motives underlying the Governor's exercise of his legislative powers, the plaintiff[s] cannot then establish the requisite material fact of deceitful motive that is necessary to continue his [sic] case.

(citations omitted.) Judge Friedman did not reach the remaining grounds for defendants' motions.

On appeal, the O'Haras raise a single issue:

(1) Did the Circuit Court err in granting the defendant's motions for summary judgment on the ground that the separation of powers principle precluded further pursuit of this action against the defendants other than former Governor Mandel on the basis of the fraud alleged in the declaration?

On cross-appeal, the defendants raise the following additional issues:

(2) Was the fraud claim properly dismissed because there was no misrepresentation of material fact but only a failure by the purchaser of corporate stock to identify the undisclosed principals for whom he was acting?

(3) Did the legally sufficient evidence at trial establish as a matter of law that the plaintiffs' fraud claim was barred by the statute of limitations?

(4) Does the death of an alleged tortfeasor who dies before judgment terminate liability for punitive damages?

Because we resolve the case on the basis of the first question, we need not, and do not, reach the others.[5]

### (ii)

The O'Haras assert three principal reasons why grant of summary judgment against them should be reversed. First, they maintain that they can make out "a prima facie case of fraudulent conspiracy" against the other defendants "without inquiring into the Governor's motives for vetoing the legislation." In *Mandel v. O'Hara, supra,* the Court of Appeals specifically rejected precisely this argument, holding:

> ... The *participation attributed to Governor Mandel in the alleged conspiracy is essential to any injury complained of by the plaintiffs, as well as to any computation of damages.* Had Governor Mandel approved House Bill 1128 any negotiations by the O'Haras for the sale of their stock would have been for stock in a corporation entitled to, or to the use of, the additional racing days.

> Indeed, in *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313, we interpreted this same complaint to make the state of mind of Governor Mandel prior to the veto critical to the claim. *Id.* at 302, 503 A.2d at 1324. It was *only* because there were conflicting factual inferences

---

5. We note that the Court of Appeals has repeatedly indicated its preference in this regard. *See, e.g., Three Garden Village Ltd. Partnership v. United States Fidelity & Guaranty Co,* 318 Md. 98, 107–108, 567 A.2d 85 (1989) ("the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment"); *Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988) (same).

whether a conspiracy antedated the veto and whether the reasons publicly given for the veto represented Governor Mandel's true reasons for the veto that the complaint escaped dismissal as a matter of law on limitations grounds. *Id.* at 302–03, 503 A.2d at 1324. *We shall not permit the plaintiffs now to minimize the role of the veto in their theory of the case after they have made critical use of the veto to avoid the defense of limitations raised by all members of the Kovens Group.* 320 Md. at 128–29, 576 A.2d 766 (emphasis added.)

The O'Haras' other two arguments are that no applicable precedent: (1) "prevents inquiry into former Governor Mandel's motives in vetoing legislation at issue now that Mr. Mandel has been offered immunity from liability," or (2) entitles "private wrongdoers" to assert a "privilege of speech or debate in defending their own corrupt involvement in a scheme to manipulate the legislative process." In support of these arguments, the O'Haras cite numerous cases dealing with common law and constitutional (speech and debate) [6] legislative immunity. These cases and the O'Haras' arguments are relevant to the case at hand only if the basis for the grant of summary judgment was former Governor Mandel's legislative immunity or if the defendants are relying upon this immunity in urging that the court below be upheld. The O'Haras treat the case as if immunity was the basis for Judge Friedman's grant of summary judgment and that defendants are relying upon that argument in upholding her judgment. In fact, Judge Friedman in no way relied upon former Governor Mandel's legislative immunity or privilege in reaching her decision.

Moreover, the defendants in their briefs and in oral argument, have expressly disavowed any reliance upon this immunity or privilege. Rather, they assert that the case at hand "does not involve the scope of legislative privilege" but a separation of powers question, *i.e.,* "whether the

---

**6.** *See* United States Constitution, Article I, § 6; Maryland Declaration of Rights, Article 10; Constitution of Maryland, Article III, § 18.

judicial branch is at liberty to inquire into the motives for the Governor's disapproval or veto of legislation." [7] Although defendants never indicate why they expressly disavow reliance on former Governor Mandel's legislative immunity, our reading of the legislative immunity cases suggests that it is because while one of the O'Haras' arguments as to that immunity is meritless, the other is correct and bars any reliance by these defendants on legislative immunity.

Thus, it seems clear that one who properly invokes legislative immunity can, contrary to the O'Haras' assertions, also invoke a legislative privilege not to testify. *See, e.g., Gravel v. United States, supra,* 408 U.S. at 616, 92 S.Ct. at 2622–23; *Miller v. Transamerican Press, Inc.,* 709 F.2d 524, 529 (9th Cir.1983); *United States v. Doe,* 455 F.2d 753, 758 n. 22 (1st Cir.1972); *In re Grand Jury Subpoena,* 626 F.Supp. 1319, 1327–28 (M.D.Pa.1986); *United States v. People's Temple of the Disciples of Christ,* 515 F.Supp.

---

7. Interestingly, one constitutional basis for legislative immunity is the separation of powers doctrine. This is so because legislative immunity was designed foremost to prevent the legislative branch from being harassed by the executive or the judicial branch in retaliation for acts performed in the execution of legislative duties. As the Supreme Court explained in *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972):

    The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process.

    *Id.* at 616, 92 S.Ct. at 2622. *See Powell v. McCormack, Speaker of the House of Representatives,* 395 U.S. 486, 502–503, 89 S.Ct. 1944, 1953–55, 23 L.Ed.2d 491 (1969); *Soucie v. David,* 448 F.2d 1067, 1081 (D.C.Cir.1971) (Wilkey, J. concurring). *See also* Ann Woolhandler, *Patterns of Official Immunity and Accountability,* 37 Case W.L.Rev. 396, 407–08 (1987) ("The roots of [speech or debate] immunity are not only in the favored place of free speech generally, but also in the critical role of speech by government in separation of powers, particularly in a system that accepts extensive judicial review"); Robert J. Reinstein and Harvey A. Silvergate, *Legislative Privilege and the Separation of Powers,* 86 Harv.L.Rev. 1113, 1119 (1973) (speech and debate clause designed primarily to be invoked by congressmen in order to prevent executive intimidation and harassment).

246, 247 (D.D.C.1981); *Holmes v. Farmer,* 475 A.2d 976, 983 (R.I.1984); *Kerttula v. Abood,* 686 P.2d 1197, 1204–05 (Alaska 1984). On the other hand, it would seem to be equally clear that legislative immunity or privilege can *only* be asserted by the officer who possesses it, and not by others. *See, e.g., Gravel, supra,* 408 U.S. at 612 n. 9, 92 S.Ct. at 2620 n. 9; *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 531–32, 97 L.Ed. 727 (1953); *Miller v. Transamerican Press, Inc.,* 709 F.2d at 527 n. 1; *Matter of Nelson,* 131 F.R.D. 161, 164 (D.Neb.1989). *See also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 326 n. 30 (D.D.C.1966). Hence, the defendants well may have concluded that it would be futile for them to rely on former Governor Mandel's legislative immunity and privilege. In any event, they do not. Accordingly, we turn to the principle upon which they do rely and which formed the basis for the holding of the court below—the separation of powers doctrine.

### (iii)

There is no concept more fundamental to our system of government than the doctrine of separation of powers among the legislative, executive, and judicial branches. When President George Washington first declined to furnish the House of Representatives with a document requested by it, he gave as his reason for refusal:

> [i]t is essential to the due administration of the Government that the boundaries fixed by the Constitution between the different departments should be preserved, a just regard to the Constitution and to the duty of my office, under all the circumstances of this case, forbids a compliance with your request.

1 Richardson, *Messages and Papers of the Presidents* 196 (1986). The doctrine of separation of powers was adopted by the founders, as Justice Brandeis explained, "not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 84–85, 71 L.Ed. 160 (1926) (dissenting opinion). Accord-

ingly, it was intended "not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Id.*

Although the separation of powers principle is evidenced by, and inferred from, the Constitution of the United States, there is no explicit federal constitutional provision articulating the doctrine. In contrast, in Maryland the doctrine "finds forthright expression," *Department of Natural Resources v. Linchester Sand and Gravel,* 274 Md. 211, 218, 334 A.2d 514 (1975), in Article 8 of the Declaration of Rights. Article 8 provides:

> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

One hundred and forty years ago, in *Wright v. Wright's Lessee,* 2 Md. 429 (1852),[8] the Court of Appeals carefully explained the purpose of the separation of powers provision:

> The evident purpose ... is to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority. That is to say, such of them as are judicial in their character to the judiciary; such as are legislative to the legislature, and such as are executive in their nature to the executive. *Within the particular limits assigned to each, they are supreme and uncontrollable.*

---

**8.** The Constitution of Maryland has always contained a separation of powers provision. The reference in *Wright* is to Article 6 of the Declaration of Rights of the Constitution of 1776, which provided as follows:

> That the legislative, executive and judicial powers of government, ought to be separate and distinct.

The additional clause in the present Constitution first appeared in Article 6 of the Declaration of Rights of the Constitution of 1851 and was repeated in Article 8 of the Declaration of Rights of the Constitution of 1864.

*Id.* at 452 (emphasis added). Moreover, the Court of Appeals has specifically recognized that "policy and intent" of the doctrine is:

> ... that the Courts and Judges provided for in our system shall, not only, not be required but shall not be permitted to exercise any power or to perform any trust or to assume any duty not pertaining to or connected with the administering of the judicial function; and that the exercise of any power or trust or the assumption of any public duty other than such as pertain to the exercise of the judicial function is not only without constitutional warrant but against the constitutional mandate in respect to the powers they are to exercise and the character of duties they are to discharge.

*Board of Supervisors v. Todd,* 97 Md. 247, 263–4, 54 A. 963 (1903). Similarly, in *Miles v. Bradford,* 22 Md. 170 (1864), the court held that the Governor in the exercise of discretionary duties is a "co-ordinate, separate, distinct and independent department of Government," and so is not subject to mandamus. *Id.* at 184–85. *See also Kendall v. United States,* 12 Pet. 524, 610, 9 L.Ed. 1181 (1838); *Worman v. Hagan,* 78 Md. 152, 165, 27 A. 616 (1893).

The authority of each branch is, of course, only absolute within the powers which the constitution assigns to it. *Springer v. Philippine Islands,* 277 U.S. 189, 211, 48 S.Ct. 480, 485–86, 72 L.Ed. 845 (1928) (Holmes, J. dissenting) ("we do not and cannot ... divide the branches into watertight compartments"). Thus, the separation of powers concept encompasses "a sensible degree of elasticity" so that beyond the core area, in response to "the practical needs of government," there has been "mingling" and "blending" of the "legislative, executive and judicial functions." *Department of Natural Resources v. Linchester, supra,* 274 Md. at 220, 334 A.2d 514. This "constitutional 'elasticity,'" however, cannot be "stretched to a point where, in effect, there no longer exists a separation of governmental power." *Id.* Accordingly, the separation of powers doctrine preserves to the one branch of government its *essential* func-

tions and prohibits any other branch from interfering with or usurping those functions. *See Shell Oil v. Supervisor of Assessments,* 276 Md. 36, 46–47, 343 A.2d 521 (1975) (separation of powers doctrine preserves to judicial branch its essential functions and prohibits legislative branch from usurping those functions).

The O'Haras do not argue (and presumably no one would argue) that a governor's veto power, a power expressly given to him by Article II, Section 17 of the Constitution of Maryland, is any thing other than an essential function of his office. *See California State Employees' Ass'n v. State,* 32 Cal.App.3d 103, 109, 108 Cal.Rptr. 60 (1973) ("the signing or vetoing of bills are acts inherently executive or political in nature, and the courts will not interfere with their performance since they require the exercise of judgment and discretion"). *See also United States v. Nixon,* 418 U.S. 683, 704, 94 S.Ct. 3090, 3105–06, 41 L.Ed.2d 1039 (1974) (judicial power of courts can "no more be shared with the Executive Branch than the Chief Executive ... can share with the Judiciary the veto power"). The real question here is whether judicial investigation into the governor's motives for exercising his veto power so encroaches upon the executive's essential functions as to be forbidden by the separation of powers doctrine. Although we have found no case directly on point, a fair reading of relevant caselaw indicates that the answer to this question can only be yes.

Whenever motives for legislative acts have been drawn into question, courts have invariably refused to authorize judicial inquiry into the motives for enactment or rejection of the legislation. For example, in *Fletcher v. Peck,* 6 Cranch. 87, 3 L.Ed. 162 (1810), when a purchaser of land claimed that a legislative act under which the seller had obtained title was a nullity because of fraud and corruption on the part of the legislators enacting it, the Supreme Court held that courts could not undertake a collateral inquiry into legislative motives. *Id.* at 131. Chief Justice Marshall explained:

It would be indecent, in the extreme, upon a private contract, between two individuals, to enter into an inquiry respecting the corruption of the sovereign power of a state. If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.

*Id.*

The holding of *Fletcher v. Peck,* that "it was not consonant with our scheme of government to inquire into the motives of legislators, has remained unquestioned." *Tenny v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). Nor has this holding been confined to situations in which the legislators were parties to the lawsuit. *See, e.g., Sugarloaf Citizens Assoc., Inc. v. Gudis,* 319 Md. 558, 577–78, 573 A.2d 1325 (1990) (*citing* numerous cases, including *Fletcher v. Peck, supra); Montgomery County v. Maryland Soft Drink Assoc., Inc.,* 281 Md. 116, 133, 377 A.2d 486 (1977) ("we do not examine the motives of legislators"); *County Council for Montgomery County v. District Land Corp.,* 274 Md. 691, 704, 337 A.2d 712 (1975) ("the judicial branch of government cannot institute an inquiry into the motives of the legislature in the enactment of laws"); *Hammond v. Lancaster,* 194 Md. 462, 476, 71 A.2d 474 (1950) ("[w]e cannot inquire into the legislative motives").

The O'Haras seek to distinguish these cases by arguing that they "proscribe judicial inquiry" in the "context of judicial review of the legislation itself" and "fear of encroachment upon the legislative prerogative is much less of a serious consideration where the person whose acts are under scrutiny is the Executive, not a member of the Legislative Branch." While a veto is not legislation itself, in *Mandel v. O'Hara, supra,* Judge Rodowsky carefully

explained why it was a legislative power, a "participation" in the "enactment of laws." *Id.* 320 Md. at 123, 576 A.2d 766 (*quoting People v. Bowen,* 21 N.Y. 517, 521–22 (1860)). Moreover, no precedent suggests that the motives of a governor for vetoing legislation require more scrutiny or are less entitled to separation of powers protection than the motives of legislators in enacting legislation.[9]

There seems to be no reason for drawing such a distinction in light of the deference accorded the Executive's motivations for performing other functions of his office, even some which, unlike the veto power, are not explicitly set forth in the Constitution. *See United States v. George S. Bush & Co., Inc.,* 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1939); *United States Cane Sugar Refiners Ass'n v. Block,* 683 F.2d 399, 404 (U.S.Ct. of Cust. & Pat.App.1982); *Hamilton v. Verdow,* 287 Md. 544, 556, 414 A.2d 914 (1980) ("principles behind the constitutional separation of powers ... place limits on a court's power to review or interfere with the conclusions, acts or decisions of a coordinate branch of government made within its own sphere of authority") (citations omitted); *Maryland Action for Foster Children, Inc. v. State,* 279 Md. 133, 152–53, 367 A.2d 491 (1977) ("Judiciary has no authority to control the Governor's discretion and require him to include more funds" in budget bill to implement statute pertaining to foster care program); *Maryland Committee for Fair Representation v. Tawes,* 228 Md. 412, 440, 180 A.2d 656 (1962) (power to call General

---

**9.** The O'Haras' reliance on *United States v. Gillock,* 587 F.2d 284 (6th Cir.1978), *reversed on other grounds,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), is misplaced. There, the court only held that a state *legislator* "has no right to claim his speech and debate privilege as to the *Governor's* exercise of the gubernatorial right of veto." *Id.* at 294 (emphasis added). The court did not make any holding with regard to a governor's own assertion of legislative privilege with regard to the veto or as to any violation of the separation of powers doctrine. *See Colorado General Assembly v. Lamm,* 704 P.2d 1371, 1385–36 (Colo.1985) (in holding Governor improperly vetoed only portion of certain items, court noted that the "veto power of the governor, when validly exercised is plenary, and this court will not inquire into the justifications for its use").

Assembly into extraordinary session "is entirely within [the] discretion" of Governor and "courts cannot direct" him to exercise such power); *Duvall v. Lacy*, 195 Md. 138, 149, 73 A.2d 26 (1950) ("no authority in judiciary to control the members of the executive department in carrying out their duties, so long as no plain violation of the Constitution or the law is found to exist"). *See also Appeal of Hartranft*, 85 Pa. 433, 445–6 (1877) (holding that governor "cannot be examined as to his reasons for not signing the bill, nor as to his action, in any respect, regarding it because ... executive department is a co-ordinate branch of the government, with power to judge what should or should not be done, within its own department, and what of its own doings and communications should or should not be kept secret, and that with it in the exercise of these constitutional powers, the courts have no more right to interfere, than has the executive, under like conditions, to interfere with the courts").

Moreover, this deference to the executive is accorded not only in cases in which the executive is a party, but also in those in which neither he nor any executive agency is a party. *See, e.g., Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 591–92, 54 L.Ed.2d 563 (1978) (in case not involving executive agency held a court must give "complete judicial deference" to "exclusive power of Executive Branch to determine" which nations are entitled to sue "in the courts of the United States"); *Williams v. Suffolk Ins. Co*, 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839) (when executive has determined to what sovereignty Falkland Islands belong, that determination is "conclusive" upon judicial branch); *Electronic Data Systems v. Social Security Organization of Government of Iran*, 651 F.2d 1007, 1011 (5th Cir.1981) ("It is for the United States Government [the Executive], not the court, to determine in the first instance the extent of its obligations under the Declarations").

In perhaps the seminal case in American jurisprudence, the Supreme Court made it clear that courts are not to

"intermeddle with the prerogatives of the executive." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803). Chief Justice Marshall explained that any "legal investigation of the acts of the President" is so "peculiarly irksome" that

> [i]t is scarcely necessary for the court to disclaim all pretenses to such jurisdiction. An extravagance, so absurd and excessive, could not be entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have discretion. Questions, in their nature political, or which are, by constitution and laws, submitted to the executive can never be made in this court.

*Id.*

These words and principles require our conclusion that the separation of powers doctrine bars judicial inquiry into a governor's motives for his veto. Since this action is dependent upon such a judicial inquiry, the grant of summary judgment was proper.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.