627 A.2d 69

**MONTGOMERY COUNTY, Maryland, et al.**

v.

**James SCHOOLEY, et al.**

**No. 1645, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 8, 1993.

Linda B. Thall, Sr. Asst. County Atty. (Joyce R. Stern, County Atty., on the brief), Rockville, for appellants.

Charles Michael Tobin (Stephanie L. Schwartz, Deborah M. Mulligan and Ober, Kaler, Grimes & Shriver, on the brief), Washington, DC, for appellees.

Argued before WILNER, C.J., and HARRELL and GETTY (JAMES S., Retired, Specially Assigned), JJ.

WILNER, Chief Judge.

In an action filed in the Circuit Court for Montgomery County, appellees challenged the councilmanic redistricting plan adopted by the County Council following the 1990 census. We are not concerned here with the validity of that plan, which has yet to be determined by the circuit court, but only with a discovery matter that arose during the litigation. The plaintiffs sought to take the deposition of a member of the County Council, Isiah Leggett; the County moved for a protective order blocking that deposition; the court denied the motion; and the County appealed. The two issues before us are (1) whether the County may appeal the denial of its motion, and (2) if so, whether the court erred in its ruling.

## I.

## PROCEDURAL BACKGROUND

The Montgomery County Charter provides for a County Council of nine persons. Four of those persons are elected from the County at large. The other five are elected from councilmanic districts, the boundaries of which are to be redetermined every ten years following the national census. The redistricting process is set forth in § 104 of the Charter. Essentially, it provides for the appointment of a bi-partisan Commission on Redistricting to prepare a "plan of councilman-

ic districts," and to present that plan, together with a report explaining it, to the County Council. The Council is required to hold a public hearing on the plan within 30 days after receiving it, and "[i]f within ninety days following presentation of the commission's plan no other law reestablishing the boundaries of the councilmanic districts has been enacted, then the plan, as submitted, shall become law."

In accordance with this procedure, a Commission was appointed following the 1990 census. On or about November 1, 1991, the Commission presented its plan and an explanatory report to the Council. Submitted with the plan and report were two minority reports presenting redistricting boundaries that were different than those recommended by a majority of the Commission. At the request of the Council's two Republican members, these minority reports were put into legislative form and, on November 7, 1991, they were introduced as bills. One of them was Bill No. 56–91.

The challenge mounted by appellees arises from what occurred to Bill No. 56–91. Upon its presentation on November 7, Councilman Hanna offered amendments to the bill deleting the councilmanic districts contained in the bill and, with certain exceptions, replacing them with boundary descriptions similar to those proposed by the Commission. In the view of the County, the Hanna amendments were ultimately adopted and the bill, as so amended, was passed by the Council and signed by the County Executive. In their four-count complaint for declaratory and injunctive relief, appellees contended, essentially, that (1) the Hanna amendments were *not* validly adopted, and (2) if the bill *did* contain those amendments, it was unconstitutional.

The first contention, as set forth in the complaint, was premised on the assertions that (1) at the November 7 meeting of the Council, the Hanna proposals were not presented as formal written amendments but were merely orally described; (2) although the Council held its mandatory public hearing on the Commission report and Bill No. 56–91 on November 26, 1991, the Hanna proposals were "not noticed for public hear-

ing and never became the subject of a public hearing" as required by the County Charter and the Council's own Rule; (3) the Council held a "work session" on December 3, 1991, but no attempt was made at that session to amend Bill No. 56–91; and (4) although on December 10, 1991, the Council purported to approve Bill No. 56–91 "as previously amended," in fact the bill had not been amended. From this, appellees urged that the bill actually passed by the Council and signed by the County Executive was the original version of Bill No. 56–91, exclusive of the Hanna amendments.[1]

In May, 1992, the defendants—the County, the County Executive, the County Council, and the County election board—having previously answered the complaint, moved for summary judgment. In June, the parties were notified that a hearing on those motions was scheduled for September 28, 1992. On September 4, appellees noted the deposition of Councilman Leggett, who apparently had served as President of the Council during its consideration of Bill No. 56–91, to take place September 24 "for the purpose of discovery, or for use as evidence, or both." The County filed a motion for protective order, alleging that "[t]he deposition of a council-member regarding issues surrounding the enactment of legislation should not be permitted, as it would violate the legislative privilege afforded to Mr. Leggett as a member of the County Council" and that Leggett's deposition "is not reasonably calculated to lead to the discovery of admissible evidence."

---

1. Appellees filed a First Amended Complaint containing a new Count V, in which they alleged that on November 24, 1991, the seven Democratic members of the Council met in a private meeting with members of the Democratic Central Committee and other elected or party officials, that during the meeting councilmanic reapportionment was discussed "and voted upon in violation of the Open Meetings Act," and that "[t]hese actions constitute a legislative function and resulted in adoption of the position advocated at the meeting and accelerated the schedule for that action." The claim that ultimate adoption of Bill No. 56–91 was invalid because of this alleged violation of the Open Meeting Law was made after the Circuit Court entered the order now before us.

In their response to the County's motion, appellees contended that (1) the County had no standing to raise Mr. Leggett's legislative privilege, (2) the legislative privilege should not, in any event, prevent them from obtaining information relevant to the case, and (3) they were not seeking information as to "legislative intent" but rather information "about the procedural aspects of the enactment" of the legislation. In that last regard, they asserted that they sought from Mr. Leggett evidence "corroborating among other things claims that there were 'factors present, not of record, which influenced the Council.'" Rather than blocking the deposition entirely, they argued, the proper approach would be to allow Mr. Leggett, who neither sought a protective order on his own nor opposed the County's request for one, to assert his legislative privilege on a question-by-question basis, as he saw fit. It appears that the court agreed with one or more of these arguments, for, on September 24, 1992, it denied the County's motion and directed that the deposition proceed. The County filed an immediate appeal and, we are told, the deposition has been postponed pending this appeal.

## II.

## APPEALABILITY

Appellees have moved to dismiss this appeal on the ground that the County has not been aggrieved by the court's order. The sole basis of the motion for protective order was Mr. Leggett's legislative privilege which, they say, is personal to him and which *he* could interpose either through his own motion for protective order or by refusing to answer specific questions. Because the County, in their view, had no right to assert vicariously Mr. Leggett's privilege, it cannot be harmed by the rejection of its motion. The argument is essentially one of "standing," although appellees do not use that word in articulating it. In support, they cite *Kreatchman v. Ramsburg,* 224 Md. 209, 167 A.2d 345 (1961); *Jabine v. Priola,* 45 Md.App. 218, 412 A.2d 1277 (1980); and *Harris v. Brinkley,* 33 Md.App. 508, 365 A.2d 304 (1976).

Those cases simply express the well-established principle that only persons with a legally cognizable interest in the proceeding are entitled to appeal from judgments entered by a trial court. None of them addressed the issue here. The Court of Appeals *did* address that issue, however, in a manner wholly inconsistent with appellees' position, in *Public Service Comm'n v. Patuxent Valley*, 300 Md. 200, 477 A.2d 759 (1984). The substantive issue there was whether individual members of the Public Service Commission could be required to appear for pre-trial depositions in an action for judicial review of a Commission order. The petitioners in that action noted the depositions of the Commissioners, the Commission moved for a protective order, and, when the motion was denied, the Commission and the State appealed. The threshold question was whether they had the right to appeal the denial of the motion.

The Court viewed that preliminary question in terms of whether the order itself was appealable under the collateral order doctrine. The standing issue did not escape its attention, however. After stating at 205, 477 A.2d 759 that "[t]he threshold question is whether the Commission and the State may appeal from the trial court's discovery order," it held, in a footnote to that statement:

"This question relates to the finality of the order and not to the standing of the Commission and the State. Even though the discovery order was directed to the individual commissioners, who were not parties to the judicial review action ... Maryland Rule 2–403(a) gives a party to the action standing to seek a protective order in a situation such as this. It follows, therefore, that a party to the action would have standing to appeal from a ruling denying the requested protective order and directing that the subject individuals appear for depositions."

*See also Dept. of Social Services v. Stein*, 328 Md. 1, 12, 612 A.2d 880 (1992).

This conclusion, though stated in a footnote, is not mere *obiter dicta*, for, if the Commission and the State did not have

proper standing, the appeal would have had to be dismissed, despite a finding that, qualitatively, the order satisfied the criteria for appealability under the collateral order doctrine. The appeal was not dismissed; the motion to dismiss was denied. We see no distinction between *Patuxent Valley* and this case on this point. The County was a party below; it was authorized by Md.Rule 2–403 to seek a protective order; and it therefore has standing to appeal the denial of its motion. The motion to dismiss the appeal is denied.

## III.

## THE MERITS

The County's motion for protective order was grounded on two theories: (1) legislative privilege; and (2) that Mr. Leggett's testimony would be inadmissible to show the Council's legislative intent, and that, accordingly, his deposition would not lead to the discovery of admissible evidence.

### A. *Legislative Privilege*

#### (1) *In General*

Members of Congress and members of the Maryland General Assembly have a separate Constitutional immunity from being called upon, in any official non-legislative forum, to defend their conduct in legislative proceedings. Article I, § 6 of the U.S. Constitution provides that "for any Speech or Debate in either House [Senators and Representatives] shall not be questioned in any other Place." A similar provision, applicable to members of the General Assembly, has appeared in the Maryland Constitution since 1776.[2] Article 10 of the

---

**2.** The 1776 Maryland provision, adopted November 3, 1776, appears to be the earliest of the American Constitutional speech and debate clauses. In *Tenney v. Brandhove*, 341 U.S. 367, 373, 71 S.Ct. 783, 786, 95 L.Ed. 1019 *reh. denied*, 342 U.S. 843, 72 S.Ct. 20, 96 L.Ed. 637 (1951), the Court noted that the Federal clause, drafted in 1787, "was a reflection of political principles already firmly established in the States," citing the 1776 Maryland provision, a provision in the 1780 Massachusetts Constitution, and one in the 1784 New Hampshire

current Maryland Declaration of Rights states that "freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature." Article III, § 18 of the State Constitution adds that "[n]o Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."

These Constitutional clauses trace their immediate history to the English Bill of Rights of 1689, although there is evidence of a much earlier origin. *See* discussion in *Holmes v. Farmer,* 475 A.2d 976, 981 (R.I.1984). They have long been regarded as "an important protection of the independence and integrity of the legislature" and, in this country, as also reinforcing the core doctrine of separation of powers. *United States v. Johnson,* 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966); also *Blondes v. State,* 16 Md.App. 165, 294 A.2d 661 (1972), *appeal after remand,* 19 Md.App. 714, 314 A.2d 746, *rev'd on other grounds,* 273 Md. 435, 330 A.2d 169 (1975). The State privilege is to be read in *pari materia* with the Federal (*Blondes,* 16 Md.App. at 175, 294 A.2d 661), and thus both are to be "read broadly to effectuate [their] purposes" (*Johnson,* 383 U.S. at 180, 86 S.Ct. at 755) and to protect not only words spoken in debate "but anything 'generally done in a session of the House by one of its members in relation to the business before it.' " *Johnson* at 179, 86 S.Ct. at 755, quoting from *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1881).

Members of local legislative bodies in Maryland, like the Montgomery County Council, are not directly within the ambit of either the State or Federal Constitutional immunity provisions, which apply only to the members of legislative bodies mentioned within them. The doctrine articulated in those provisions has, however, been regarded as applicable to members of local and regional legislative bodies (as well as to State

----

Constitution. In a footnote, it observed that in two other 1776 Constitutions (South Carolina and New Jersey), the privilege was protected by general provisions preserving English law. *Id.* 341 U.S. at 374, 71 S.Ct. at 787.

legislatures, in addition to any specific State Constitutional provision) as a matter of common law—the "common law doctrine of official immunity." *Thillens, Inc. v. Community Currency Exchange,* 729 F.2d 1128, 1129 (7th Cir.), *cert. dismissed,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 342 (1984).

The source, nature, and scope of this common law privilege are not altogether clear and, to some extent, may depend on the context in which the privilege is asserted. When invoked in defense of a Federal criminal prosecution, for example, the common law privilege has been held to be inapplicable— "trumped" by the Supremacy Clause in the U.S. Constitution. *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). When there is no such paramount Federal interest, however, the privilege has been respected by both Federal and State courts.

In *Lake Country Estates v. Tahoe Planning Agcy.,* 440 U.S. 391, 403, 99 S.Ct. 1171, 1178, 59 L.Ed.2d 401 (1979), the Court observed that the privilege had its roots in the parliamentary struggles of 16th and 17th century England and that "such immunity was consistently recognized in the common law and was taken as a matter of course by our Nation's founders." *See also Bruce v. Riddle,* 631 F.2d 272 (4th Cir.1980); *Baker v. Mayor and City Council of Baltimore,* 894 F.2d 679 (4th Cir.), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *Hollyday v. Rainey,* 964 F.2d 1441 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992). In *Baker,* the Court, citing *Bruce,* declared it "beyond dispute that municipal legislators enjoy the protection of immunity when acting in the sphere of legitimate legislative activity." *Id.* at 681. Subject to the consequences of the Supremacy Clause, that immunity, conferred as a matter of common law, appears to be co-extensive in scope with the Constitutional immunity enjoyed by members of Congress and the Maryland General Assembly. In *Bruce v. Riddle, supra,* 631 F.2d at 279, the Fourth Circuit Court of Appeals referred to it as an "absolute" immunity.

In various cases, the Supreme Court has construed the Federal provision as immunizing members of Congress against both criminal and civil liability based on their legislative conduct, whether the action is for prospective relief or damages. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Indeed, it goes even farther. In *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 731–32, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980), the Court, quoting in part from earlier cases, observed:

> "The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference.... To preserve legislative independence, we have concluded that 'legislators engaged "in the sphere of legitimate legislative activity" ... should be protected not only from the consequences of litigation's results *but also from the burden of defending themselves.*' "

(Emphasis added.)

This last statement, first made in *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967), construing the privilege as protecting a legislator against both the consequences of litigation and the burden of even having to defend himself in a court proceeding, has resulted in the privilege being regarded as both a bar to proceedings seeking to establish liability against the legislator and as a *testimonial* privilege. The Supreme Court held as much in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583, *reh. denied*, 409 U.S. 902, 93 S.Ct. 98, 34 L.Ed.2d 165 (1972).

*Gravel* arose from a grand jury investigation into possible criminal conduct arising from the release of classified Defense Department documents (the "Pentagon Papers"). The Government subpoenaed a staff aide to U.S. Senator Mike Gravel. Senator Gravel intervened and moved to quash the subpoena and to require the Government to specify the questions it intended to ask the aide. One of the areas of inquiry was a Senate subcommittee meeting convened and chaired by Senator Gravel at which the classified documents were read and placed in the public record. The U.S. Court of Appeals for

the First Circuit had approved a protective order precluding the questioning of the Senator or his aide, but not third parties, about Senator Gravel's conduct at that subcommittee meeting. Although the Supreme Court vacated that order, essentially as being too broad, it said, at 615–16, 92 S.Ct. at 2622:

> "[Senator Gravel's] insistence is that the Speech or Debate Clause at the very least protects him from criminal or civil liability *and from questioning elsewhere than in the Senate,* with respect to the events occurring at the subcommittee hearing at which the Pentagon Papers were introduced into the public record. To us this claim is incontrovertible.... *We have no doubt that Senator Gravel may not be made to answer—either in terms of questions or in terms of defending himself from prosecution—for the events that occurred at the subcommittee meeting."*

(Emphasis added.)

It would seem from this pronouncement that a legislator, even if not a party to the action and thus not subject to any direct consequence of it, cannot be compelled to explain, other than before the legislative body of which he is a member, either his legislative conduct or "the events that occurred" in a legislative session. Lower Federal courts have construed it that way as well. In *Schlitz v. Com. of Va.,* 854 F.2d 43 (4th Cir.1988), the plaintiff, a State judge, sued the Commonwealth of Virginia, complaining that the failure of the Virginia legislature to reappoint him was due to the fact that he was over 70 and thus constituted a violation of the Federal Age Discrimination in Employment Act. Even though no member of the Virginia legislature was named as a defendant or was subjected to any direct consequence of the action, the Court held that the suit was barred by legislative immunity, stating at 45: "Where, as here, the suit would require legislators to testify regarding conduct in their legislative capacity, the doctrine of legislative immunity has full force."

Even more to the point is *Marylanders for Fair Representation v. Schaefer,* 144 F.R.D. 292 (D.Md.1992), an action challenging the 1992 legislative redistricting plan. Among

other things, the plaintiffs sought to take the depositions of the President of the Maryland Senate (Thomas V. Miller, Jr.), the Speaker of the House of Delegates (R. Clayton Mitchell, Jr.), and certain other members of the General Assembly. The State objected to those depositions as well as to any inquiry into "legislative 'motive' concerning the introduction of the redistricting plan." *Id.* at 295.

Miller and Mitchell, in addition to their legislative positions, had been members of a Gubernatorial Redistricting Advisory Committee that had assisted the Governor in preparing Congressional and legislative redistricting plans for presentation to the 1992 session of the General Assembly. In accordance with the State Constitutional process regarding redistricting, the plans were submitted by the Governor and, because they were not amended by the General Assembly and no alternative plans were adopted, they took effect as submitted.

In an Opinion for the three-judge court, Judge Smalkin noted, at 297–98, that "[l]egislative immunity not only protects state legislators from civil liability, it also functions as an evidentiary and testimonial privilege" and that, as a result, "a state legislator acting 'within the sphere of legitimate legislative activity' may not be a party to a civil suit concerning those activities, *nor may he be required to testify regarding those same actions.*" (Emphasis added.) Although Judges Murnaghan and Motz—the other members of the court panel—differed as to certain other conclusions reached by Judge Smalkin, they concurred in that part of the opinion, stating, as to Senator Miller and Delegate Mitchell:

> "We, too, however, would flatly prohibit their depositions from being taken as to any action which they took after the redistricting legislation reached the floor of the General Assembly as President of the Senate and Speaker of the House, respectively (unless they ultimately are listed by the Defendants as trial witnesses) because of the direct intrusion of such discovery into the legislative process."

*Id.* at 305.

It is evident, and appellees do not contend otherwise, that, in considering the councilmanic redistricting plan in general

and Bill No. 56–91 in particular, the County Council was acting in a legislative capacity. *Schaefer, id.; Holmes v. Farmer,* 475 A.2d 976 (R.I.1984). Appellees seek to escape the bar of the privilege on two bases. First, they contend that the privilege is a personal one that may be exercised only by Mr. Leggett and not by the County. Second, they urge that the privilege, in any event, is not unlimited in scope and does not preclude inquiry into matters other than Leggett's motives. Although their notice of deposition was unrestricted, in defending against the motion for protective order they made clear that they sought information only as to "the procedure during a legislative session, whether public notice of said meeting was given, who was present at such meetings, and what general topics were discussed."

The focus of the desired inquiry was further narrowed, or clarified, at oral argument before us. It centered on the alleged meeting of November 24, 1991 referred to in footnote 1, *ante.* Appellees acknowledged that the proceedings of all other meetings of the Council were electronically recorded and that actions taken there were recorded in official minutes. The proceedings of the November 24 meeting were not so recorded, however, and there seems to be a dispute between at least two of the people who were there as to what occurred. Although a number of people other than councilmen were present and could be questioned about what occurred, appellees nevertheless desire to have Mr. Leggett's testimony as to these matters.

### (2) *Standing*

The question here is whether, under Md.Rule 2–403(a), the County is entitled to invoke Mr. Leggett's privilege when he has neither sought to invoke that privilege himself nor opposed the County's attempted invocation of it. Although courts have examined this question in a number of different contexts, there is no clear answer that we can find. Part of the problem, we think, lies in the dual purpose of the privilege itself—to shield individual legislators from having to account for their legislative conduct to Executive or Judicial tribunals

or officials and, thereby, to preserve the legislative branch as a whole from encroachment by another branch of government.

When the legislator himself is the defendant or target, whether in a criminal prosecution or a civil action, the privilege is obviously a personal one that he may exercise. *Gravel v. United States, supra,* 408 U.S. 606, 92 S.Ct. 2614. *See also Spallone v. U.S.,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), *citing Coffin v. Coffin,* 4 Mass. 1, 27 (1808). It is indeed not yet clear, at least with respect to the Federal Speech and Debate privilege, whether he even can waive it. In *United States v. Helstoski,* 442 U.S. 477, 492, 99 S.Ct. 2432, 2441, 61 L.Ed.2d 12 (1979), the Court found it unnecessary to decide "whether an individual Member may waive the Speech and Debate Clause's protection against being prosecuted for a legislative act" but concluded that, if waiver *was* possible, it could only be found "after explicit and unequivocal renunciation of the protection." *Id.* at 490–91, 99 S.Ct. at 2440. Until some higher court declares that the privilege cannot be waived by the individual, the privilege would seem, *in that setting,* to be neither a substantive rule of law making the legislator incompetent as a witness nor a rule of evidence declaring a category of evidence otherwise obtainable from him inadmissible. If the legislator chooses to testify, we see no reason why he should not be permitted to do so. The privilege is his alone because the consequence of not having or asserting it falls on him alone, and he can assert or waive it at his discretion.

That principle, which fits so neatly in that context, becomes more tenuous when the attack is not just on the conduct of an individual legislator but rather on the legislative body as a whole or on some committee of that body, for it then calls into question the legislative conduct of more than one member. The privilege is personal to *each* member of the legislative body, and it therefore protects *each* from being called upon to explain his legislative conduct in another official forum. It is, indeed, the cumulative effect of these individual privileges that serves the broader purpose of the privilege—protecting the independence and integrity of the Legislature as an institution of republican government. The problem is a very practical

one, but one that raises quite clearly the underlying Constitutional concern.

If the attack is on the legislative process itself or on the end product of that process, rather than on the conduct of an individual legislator, the motivation and legislative conduct of each member associated with the challenged process or product necessarily comes into question. If even one member is permitted to waive his individual privilege and testify in support of the attack, the other members will, perforce, be required either to respond or risk the consequence of an adverse judgment based, at least in part, on the unfavorable testimony of their colleague. When viewed in that context, the waiver by one legislator of his privilege may, in effect, dictate the waiver by other legislators of their privilege. One willing member could thus cripple the privilege of other members and be the instrument for dismantling the separation of powers pillar upon which the privilege is, in part, based.

A number of courts, including this one, have made broad statements to the effect that "legislative immunity or privilege can *only* be asserted by the officer who possesses it, and not by others." *O'Hara v. Kovens,* 92 Md.App. 9, 20, 606 A.2d 286, *cert. denied,* 328 Md. 93, 612 A.2d 1316 (1992) (citations omitted). *See also Marylanders for Fair Representation v. Schaefer, supra,* 144 F.R.D. at 299, n. 16.[3] In a proper context, we adhere to that view. But in the current setting, application of that principle, for the reasons just noted, would serve not to protect the privilege but, effectively, to destroy it.

---

**3.** As noted earlier, Senator Miller and Delegate Mitchell had also served on a gubernatorial advisory commission, and their testimony was sought with respect to proceedings in that group as well. The privilege was applicable only to proceedings in the General Assembly. Thus, there were areas of inquiry not protected by the privilege, upon which the Court held they could legitimately be examined. That, we presume, is why the Court left it to the legislators to invoke their privilege in conformance with the Court's ruling. The District Court did not deny the State's motion on standing grounds.

It was clearly this concern that led the Fourth Circuit Court of Appeals to dismiss the age discrimination suit in *Schlitz v. Com. of Va., supra*, 854 F.2d 43. At 46, the Court observed that "the Commonwealth would be unable to defend this action unless the legislators testify as to their motives for declining to re-elect plaintiff. This the doctrine of legislative immunity will not allow." The Court went on to reject the notion that the problem it identified could be circumvented if the plaintiff declined to name individual legislators as defendants: "The purpose of the doctrine is to prevent legislators from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves." *Id.* at 46 (citations omitted). *See also Hollyday v. Rainey, supra*, 964 F.2d 1441, 1443; *Baker v. Mayor and City Council of Baltimore, supra*, 894 F.2d at 682. It may have been a similar concern that led the Court of Appeals in *Patuxent Valley, supra*, 300 Md. at 205 n. 2, 477 A.2d 759, to determine that "[e]ven though the discovery order was directed to the individual commissioners, who were not parties to the judicial review action ... Maryland Rule 2–403(a) gives a party to the action standing to seek a protective order *in a situation such as this*." (Emphasis added.) The Court was not dealing in *Patuxent Valley* with the legislative privilege as such, but we think the conclusion reached there is equally applicable here.

We therefore conclude that the County had standing under Rule 2–403 to invoke the privilege on behalf of Mr. Leggett and, in effect, on behalf of the other members of the Council.

### (3) *Scope of Privilege*

As we observed, appellees, in their arguments to the Circuit Court and to this Court, have narrowed considerably the scope of their otherwise unlimited notice of deposition. They have effectively renounced any intent to inquire into matters and events occurring during regularly scheduled meetings of the Council and have focused their attention on the meeting of November 24, 1991. That was a private political meeting, they contend, and although in their brief they refer to it as a "legislative session," they aver that they are entitled to inquire

as to "factors present, not of record, which influenced the Council."

The first question here is whether the November 24 meeting, as appellees have described it, constitutes a legislative session for purposes of the privilege. The Fourth Circuit Court of Appeals dealt with a similar question in *Bruce v. Riddle, supra,* 631 F.2d 272. The suit there, brought under 42 U.S.C. § 1983, was against the members of a county council for adopting an allegedly unconstitutional zoning ordinance. The plaintiff, whose property was downzoned, complained that the ordinance was adopted in bad faith after individual members of the council met in private "with unnamed influential citizens of the area who owned nearby residential property" to discuss "protection of the private interests of these influential citizens." *Id.* at 274. The argument was made that the defendants acted outside their legislative privilege "by meeting privately with interested individuals who tended to influence their vote on the zoning ordinances," *id.* at 279, a contention nearly identical to that made by appellees with respect to the November 24 meeting. The Court rejected the argument, stating at 279:

> "The proof of these allegations at trial would not remove the defendants from the scope of their legislative activities. There may well be circumstances involved in private meetings by legislators that would remove them from the umbrella of legislative immunity. Illegal acts such as bribery are obviously not in aid of legislative activity and legislators can claim no immunity for illegal acts. Plaintiff, however, alleges no such illegal conduct."

It is evident from this that the legislative process, for purposes of the privilege, includes more than just proceedings at regularly scheduled meetings of a legislative body. If it includes a meeting with citizens or private interest groups, it must also include caucuses and meetings with political officials called to discuss pending or proposed legislation.

On this record, as we have it, we are hard-pressed to see what areas of inquiry *would* be permissible as falling outside

the privilege. Because the issue was presented and resolved below as an all-or-nothing proposition, however—either quash the notice of deposition or allow the deposition to proceed without advance limitation—the court did not address whether there were specific areas of permissible inquiry. Such areas may exist, and appellees should be given an opportunity to define them. After considering the County's second argument—that of relevance—we shall remand the case for that purpose.

## B. *Relevance*

The second principal basis for the County's motion for protective order was that Leggett's deposition is not reasonably calculated to lead to the discovery of admissible evidence and is therefore not justified under Md.Rule 2–402(a). The thrust of this argument is that, if the deposition is for the purpose of inquiring into Councilman Leggett's motives or intent in dealing with the redistricting plan or Bill No. 56–91, such testimony would be inadmissible. The legislative intent of the Council cannot be established by the intent of its individual members. *Liquor Stores Assn. v. Commrs.*, 171 Md. 426, 430, 189 A. 209 (1937). Other facts evidencing legislative acts, the County repeats, can be discovered through transcripts or minutes of Council proceedings.

All of this is true, but appellees maintain that there are areas of inquiry that *could* lead to admissible evidence, even though we cannot ascertain from this record what they might be. To a large extent, the areas of permissible inquiry under Rule 2–402 may overlap those that may be permissible under the privilege. As we are remanding for a further proceeding in that regard, we shall permit appellees to establish, if they can, their entitlement to depose Mr. Leggett under the Rule.

ORDER DENYING MOTION FOR PROTECTIVE ORDER VACATED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS; APPELLANTS AND APPELLEES TO PAY THEIR OWN COSTS.